THE STATE, EX REL. HERMAN SCHALK, v. JAMES T. WRIGHTSON, CLERK OF ESSEX COUNTY.

1. The legislature may reduce the number of judges of the Common Pleas to any number less than five, and may prescribe the qualifications of the judges.
2. The legislature cannot abolish the Court of Common Pleas, but if it is conceded that it has such power, then, so long as the jurisdiction which resides in that court is exercised for the benefit of the people, it must be exercised by judges appointed as heretofore.   It cannot be bodily transferred, to be exercised by judges not appointed as the constitution prescribes.
3. The legislature cannot, by adding to or subtracting from the duties of a given office, or by uniting one office to another, acquire the right to appoint the officer in a manner other than that prescribed by the supreme law.
4. The act of June 13th, 1895, known as the County Court act, is unconstitutional.

On application for *mandamus*.

Argued at June Term, 1895, before Justices VAN SYCKEL, MAGIE and LIPPINCOTT.

For the relator, *Collins & Corbin* (with whom, was *Chauncy H. Beasley*).

The practice adopted in this case is that sanctioned in *State* v. *Wrightson*, 28 *Vroom* 126, and *McPherson* v. *Blacker*, 146 *U. S.* 3, as to the jurisdiction to exercise the writ of *mandamus* to prevent the enforcement of an invalid law to the prejudice of the relator.

The relator is one of the judges of the Court of Common Pleas appointed by the governor under the constitution (article 7, section 2, paragraph 1), which provides : "Justices of the Supreme Court, Chancellor, judges of the Court of Errors and Appeals and judges of the Inferior Court of Common Pleas shall be nominated by the governor and appointed by him, with the advice and consent of the senate."

The amendment of 1875 consisted in adding to the previous words the following : "And judges of the Inferior Court of Common Pleas."

Chapter 162 (laws 1895) purports to abolish the Courts of Common Pleas, Sessions and Oyer, and to establish a new court, called the County Court, with one judge, to act with the Supreme Court justice and exercise all the present jurisdiction of the abolished courts under the same practice. The supplement (chapter 325, laws 1895) increases the number of judges to be elected, allotting one to each county.

We will discuss the question under five divisions.

*First.* Is the Court of Common Pleas a court which can be abolished by act of the legislature ?

*Second.* Has the court been abolished by the laws of 1895, chapters 162 and 325 ?

*Third.* Can judges who exercise the powers of the Common Pleas judges be chosen by any other authority than the governor ?

*Fourth.* Is the act (chapter 162) valid ?

*Fifth.* Is the supplement (chapter 325) valid ?

I. Can the Common Pleas be abolished by act of the legislature ?

The constitution of 1844 (article 6, section 1) named certain courts in which the judicial power should be vested, not naming, especially, the Court of Common Pleas, but adding to the list of courts the following: "And such inferior courts as now exist and as may be hereafter ordained and established by law, which inferior courts the legislature may alter or abolish as the public good shall require." By an amendment of 1875 it was provided that certain judges (among others, judges of the Inferior Court of Common Pleas) shall be nominated by the governor and appointed by him, with the advice and consent of the senate, and that they shall hold office for five years. It is a fairly debatable question whether, under the power to alter or abolish inferior courts, the legislature can abolish any other courts than those which they create. This doubt is strengthened by the amendment of 1875 and by the character of the Court of Common Pleas, which, from the earliest days, has been a court exercising an important part of the judicial power of the province and state.

The constitution gives the judges a term of five years. The legislature cannot legislate them out of office directly. Can they do so indirectly, by a merely nominal abolition of the court?

II. Has the court been abolished by the act?

We do not, under this head, discuss the question whether the act is within the title. We contend that what has been done is not to abolish the court, but merely to change its name and reduce the number of judges and make one of the judges elective. That this is the substance appears from the fifth and sixth sections. The fifth section provides that the Supreme Court justices, together with the judges to be elected, shall be the judges of the county courts. Section 6 provides that the county courts shall have, and each of them is hereby invested with and may exercise all the jurisdiction heretofore conferred upon or exhibited by any and all of the courts mentioned in the first section of the act. These courts are the Common Pleas, Court of Oyer and Terminer and Quarter

Sessions. The act proceeds to provide that the practice heretofore provided in those courts shall continue, and that the judge of a county court shall have the powers both of the presiding and of the other judges of these courts, provided that a justice of the Supreme Court shall preside at a trial for a crime punishable by death. The substantial effect of these provisions is precisely the same as if it had been provided that hereafter there shall be one judge elected by the people to take the place of the three judges now required to hold the Court of Common Pleas, of Oyer and Terminer and General Quarter Sessions of the Peace, and that these courts shall be called the County Court.

Now, the question is whether, by merely changing the name of the courts without changing the practice or the jurisdiction, the method of appointment of the judges holding them prescribed by the constitution can be changed. Observe, what the act undertakes to accomplish is a mere matter of office-holding. Certain officers are to be put out and a smaller number are to be elected in their stead. This is practically the whole act except the change of name. It is not the Court of Common Pleas which has been abolished; it is merely the terms of the present judges. What is it that constitutes the identity of the court? The place of holding court remains the same, the territorial jurisdiction the same, the subject-matters over which jurisdiction may be exercised the same, the persons over which jurisdiction may be exercised the same, all the officers except the judges remain the same and perform the same duties, the Supreme Court justices continue to be members with the same duties, the practice remains the same. What has the legislature undertaken to abolish? Merely the provision of the constitution that the governor shall appoint the judges. That is the whole substance of the act; all the rest is form. In spite of the new name of county judge, it requires no deep scrutiny to recognize the familiar features of our ancient friend, the judge of Common Pleas, named in the constitution.

Our authorities on this point appear under the next point of this argument.

III. Can judges who exercise the powers of the Common Pleas judges be chosen by any other authority than the governor?

The policy of the constitution established by the amendment of 1875 is that the judges of the Common Pleas, as well as of the other high courts of the state, shall be appointed by the governor. The question we now raise is not whether the Court of Common Pleas can be abolished or not. Assuming for the sake of argument that the power to abolish exists and has been exercised, the question remains, Can the functions of the judges of that court be transferred by the legislature to judges not appointed by the governor? If so, it is evident that the amendment of 1875 above cited has no efficacy as a restraint upon legislative power, and that it means merely that judges of that court shall be appointed by the governor only while the court retains its present name. We contend that the constitutional powers of the governor cannot be so easily shorn. The constitution regards substance and not form. The judges who are to be appointed are those who exercised the general powers held by the judges of the Common Pleas at the time of the constitutional amendment.

The New York constitution of 1821 provided that county clerks should be elected by the people. The county clerk was, at the time of the adoption of the constitution, the clerk of the Court of Common Pleas. Under an act passed in 1843 it was provided that the clerk of the Court of Common Pleas in New York city should be appointed by the court and should be and act as clerk of the county court.

This act was held void. Mr. Justice Bronson said that the legislature might regulate the duties and fees, and, perhaps, abolish the office of county clerk, but the choice of the officers performing the duties belongs to the electors. "They cannot be deprived of their right by changing the name of the office or by dividing it into parts." This judgment was affirmed on writ of error. *Warner* v. *People*, 2 *Den.* 272, 274, 278.

In *People* v. *Draper*, 15 *N. Y.* 532, a similar subject was

considered. The New York constitution of 1853 required that local officers should be chosen by local constituencies.

Mr. Justice Denio said : " It is not enough to take the case out of the provisions of this section, that the names of the offices existing when the constitution was adopted are afterwards changed by an act of the legislature or that their functions are colorably modified. The constitution regards substance and not mere form." *People* v. *Draper,* 15 *N. Y.* 532, 539.

It was, however, there decided by a divided court that the new police office there created was not a successor to the former police department of the city.

But this decision was substantially overruled in *People* v. *Albertson,* 55 *N. Y.* 50, 57, on grounds which carry to a greater length the principle above quoted from the opinion of Judge Denio. In that case the design of the act was to substitute for the police force in the city of Troy, under municipal direction, a new board covering a great part of the county of Rensselaer, to be called the Rensselaer police district, with the purpose of appointing these officers by the legislature. The constitution required that all county, city and town officers should be elected by the electors.

Mr. Justice Allen said, in the course of an opinion which is all useful to be read in this connection : " The constitution cannot be evaded by a change in the name of an office, nor can an office be divided and the duties assigned to two or more officers under different names, and the appointment to the offices made in any manner except as authorized by the constitution ; and courts will scrutinize acts of the legislature and see that the constitution is not evaded and its intent frustrated by a mere colorable change in the designation and title of the duties of an officer, when the appointment is taken from the locality, and will hold the act void unless the change is real and substantial." And the court continues that the whole scheme would fail and the act would be annulled, if, for any reason, the appointment could not be made as required by the act. This case is cited in *State* v. *Wrightson,* 27 *Vroom* 126, 201.

Another New York case of interest in this connection is *People* v. *Raymond,* 37 *N. Y.* 428, 431. There the act under consideration provided for the appointment of certain commissioners to review taxation by the governor. The constitution required city officers existing at the time of the constitution to be elected. The court held that the duties charged upon the new commissioners were the same as those which, at the time of the constitution, had been discharged by the city assessors.

Mr. Justice Grover said: "An examination of the duties and powers will show that they are all such as are calculated to facilitate the same essential duty performed by the assessors—that is, of perfecting a valuation of the property as a basis of taxation. Such additional facilities in the performance of the same duties cannot make them new officers in the sense of the constitution. If they can thus be made new, the section of the constitution above quoted may readily be made a mere nullity. *  *  *

"It is not enough that the name of the officer is changed or the powers enlarged, to authorize the legislature to confer upon the governor the appointment of officers to discharge the duties performed by city officers at the adoption of the constitution."

The only difference between these cases and that in question is that in New York the encroachment was attempted upon the appointing power of the people, here of the executive. One is as much entitled to protection as the other. See, further, *People* v. *McKinney,* 52 *N. Y.* 374; *People* v. *Bull,* 46 *Id.* 57.

Judge Cooley, in his work on *Constitutional Limitations,* after stating that the law-making power is subject to no restraints except such as are imposed by the constitution, goes on to say: "It does not follow, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the constitution some specific inhibition which has been disregarded or some express command which has been disobeyed," and he cites as a "remarkable case of eva-

sion to avoid the purpose of the constitution and still keep
within its terms," *People* v. *Albertson,* 55 *N. Y.* 50, and also
*Taylor* v. *Ross County,* 23 *Ohio St.* 22, where he says: "The
Supreme Court of Ohio finds itself under the necessity of
declaring that that which was forbidden by the constitution
could no more be done indirectly than directly."

In opinion of the justices (117 *Mass.* 603), the constitution
required that registers of probate should be elected by the
people.

The court said that the office might be abolished, but that
the principal recording officer of the county, whether called
register or clerk, must be elected by the people, and that his
appointment could not be conferred upon the governor.

*State, ex rel. Kennedy,* v. *Brunst,* 26 *Wis.* 412, is to the
same effect. There the constitution required that the people
should elect the sheriff. An act was passed taking the con-
trol of the jail from the sheriff and transferring it to a jailer
appointed by the county supervisors. This was held an eva-
sion of the constitution. Mr. Justice Cole said: "It would
certainly be an idle provision to secure to the electors the
right to choose their sheriffs and at the same time leave to
the legislature the power to detach from the office of sheriff
all the duties and functions by law belonging to that office
when the constitution was adopted, and commit those duties
to some officer not elected by the people."

*State* v. *Leonard,* 86 *Tenn.* 485, is a close precedent and
merits full quotation. After setting forth an act of 1885
and the election of a county judge thereunder, and its repeal
in 1887 by the act under review, the court proceeds: "The
first section of article 6 of the state constitution provides
'that the judicial power of this state shall be vested in one
Supreme Court and such Circuit, Chancery and other inferior
courts as the legislature shall from time to time ordain and
establish in the judges thereof and in justices of the peace.'
The fourth section of the same article provides 'that the
judges of such inferior courts shall be elected by the qualified
voters of the district or circuit to which they are to be

assigned, and that their terms of office shall be eight years.' The question is, Can the legislature, subsequently and within that term, deprive him of the office by devolving its powers and duties upon another? The act of 1887 did not, and did not attempt to, abolish or diminish the powers and duties appertaining to the office. It simply repealed so much of the act as applied to Marshall county and undertook to re-establish the office of the chairman of the county court after the first Monday in April, 1887, and to vest in this office 'all the rights, privileges, jurisdiction, duties and powers' pertaining to the office as established and exercised by the county judge. If this legislation had merely named the defendant, and by name and title removed him from the position and given it to another, it could not have more directly accomplished the purpose actually effected if it be valid."

The court goes on to say that the purpose in fixing the term of office was not only to make these judges independent, but to prevent constant experiment with court systems. The conclusion was that the act was invalid and the judge retained his office. "It is not in the power of the legislature to take from him the powers and emoluments of office during the term of eight years by devolving those intact upon another or otherwise."

Observe, in this case there was no dispute of the power to abolish the court. It had been created and could be terminated by the legislature. But the term and powers conferred for eight years could not thereby be taken away because protected by the constitution. See *Com.* v. *Gamble*, 62 *Penn.* 343, 352; *State* v. *Draper*, 50 *Mo.* 353; *State* v. *Thomas*, 10 *Kan.* 191, 195; *Lome* v. *Com.*, 3 *Metc.* (*Ky.*) 237, 241; *People* v. *Dubois*, 23 *Ill.* 547, 549.

IV. Is chapter 162, laws of 1895, valid?

We think that the provision for election under this act fails for indefiniteness. No date or place for an election is fixed, and no provision is made for election officers or for canvass of return of the votes.

V. Is chapter 325, laws of 1895, valid?

This act, called a supplement, is really an amendment to the original act. It is not correctly described in the title, and it amends by mere reference to the title of the former act.

For the respondent, *Sherrerd Depue* and *Chandler W. Riker* (with whom was *Joseph L. Munn*).

This is an application for an alternative or peremptory writ of *mandamus*, commanding the clerk of Essex county to disregard the act of the legislature of this state, passed March 14th, 1895, and known as the County Court act.

The ground upon which the application is based is the alleged conflict between the provisions of the act and the fundamental law of the state.

The relator, to succeed in his application, must establish one of two propositions—either that the act in question does not alter or abolish the Inferior Courts of Common Pleas for the several counties of this state, or that such alteration or abolition contravenes the state constitution.

I. That the effect of the act is to abolish that court seems plain on its face. The object of the act, as expressed in its title, is "to abolish the Inferior Courts of Common Pleas, Courts of Oyer and Terminer and General Jail Delivery and Courts of General Quarter Sessions of the Peace, and to establish in their place a County Court in each of the counties of this state, and to provide for and define the jurisdiction, powers and duties of such County Courts."

The provisions of the first section of the act are explicit. The courts designated are, in the language of the act, "abolished" and a County Court established in their place.

The legislative scheme was plainly this: to wipe out of existence the four courts designated with their three judges, and to establish in their place a single court presided over by a single judge. No more complete destruction of the original courts could be effected. Their existence as courts is destroyed. The judges, a necessary part of the court, are removed from an office which no longer continues to exist. A new and larger jurisdiction is conferred upon the new County Court.

It is invested with "jurisdiction and cognizance of all crimes, misdemeanors and offences whatsoever committed, done or attempted within the counties respectively, and of causes of civil and penal actions arising therein." (Section 6 of act.) Absolute civil and criminal jurisdiction is something the Courts of Common Pleas do not enjoy. But if the contention of the relator, that the new court is endowed with similar powers and jurisdiction, is sustained by correct construction of the act, it cannot alter the effect of the legislation, for civil and criminal powers must be vested in some judicial authority, so long as the semblance of government remains. No more effective abolition of a judicial tribunal can be accomplished than is done by express legislative enactment, and the destruction of the judicial offices necessary to support the existence of the courts.

But if this legislative enactment was not operative to abolish the courts enumerated, it certainly accomplished a substantial and even radical alteration in their structure. Such alteration is distinctly within the powers conferred upon the legislature by the constitutional provisions in question. The argument of the relator proceeds upon the theory that, in altering the Inferior Courts of Common Pleas, the legislature is prohibited from altering the method of selecting the judges. This conclusion is neither necessitated nor justified by the rules of statutory construction. Giving to the direction that "the judges of the Inferior Court of Common Pleas shall be nominated by the governor and appointed by him with the advice and consent of the senate," its fullest effect, its requirements are satisfied by executive appointment, so long as the courts themselves remain unaltered. No such indirect provision as this can, by implication, limit the powers expressly conferred on the legislature to alter these courts.

II. This brings us to a consideration of the power of the legislature to abolish the Courts of Common Pleas.

In order to properly investigate this question, a brief review of the history of that court, as traced in the early records of this state, will be useful.

Courts were held in Monmouth county under the patent of Governor Nichols, of New York, as early as 1667 and 1668. Courts were held in Bergen and Woodbridge under the authority of the same governor. Newark held its own town courts annually, as early as 1669, and before any court had been established by the legislature the people had chosen men to fill the office of justice of the peace, the judicial officer coming closest to the people, and one that seemed necessary to the preservation of good order. 1 *Proc. N. J. Hist. Soc.* 167; *Field Prov. Courts* 6; *Newark Town Records* 13.

It was the justice of the peace that furnished the material for the first court created by the act of the legislature of New Jersey. The assembly in East Jersey created several courts in its session at Elizabethtown, in 1675. It provided for a monthly court for the trial of small causes, to be held by three persons, one of whom should be a justice of the peace, in each county. Provision was also made for a county court, to be held twice a year in each county, the judges to be elected by the people, and it was declared " that all causes actionable shall be tried before the county court, from whence there shall be no appeal except to the Bench or to the Court of Chancery." The "Bench" seems to have been a court of assize, held in the town of Woodbridge on the 1st day of October of every year. *Acts* 1675, *ch.* 6, 7, 14; *Leam. & Spi.* 96, 99.

In 1682 the assembly divided the province into four counties and proceeded to make a new organization of the courts. It was enacted that there should be one court held monthly throughout the year in every town for the determination of small causes, the cases to be tried by three persons, without a jury. There were to be county courts held every year for the trial of all cases which might be brought there, both civil and criminal, the judges to be the justices of the peace of the several counties, or three of them, at least.

In 1682 there was erected by statute a new court, called the Court of Common Right, with criminal jurisdiction and jurisdiction over civil causes, both in equity and common

law. This court was declared to be the Supreme Court of the province, and consisted of twelve members, or six, at least. *Leam. & Spi.* 232.

In West Jersey, in 1681, the statute provided that there should be in every court three justices or commissioners, at least, to sit with the twelve men of the neighborhood, and with them to hear all causes and assist the twelve men with the law, and pronounce the judgment of the twelve men in whom the judgment resides. In 1682 it was enacted that four Courts of Session should be held yearly at Burlington and Salem, with unlimited jurisdiction, civil and criminal, except in cases of a capital nature. In 1685 provision was made for courts of small causes, to be held by one justice of the peace, with an appeal to the County Court or Court of Sessions. *Leam. & Spi.* 428.

In 1693 a county court was created in the new county of Cape May, with a limited jurisdiction, which limit was afterwards removed. *Leam. & Spi.* 520.

The Court of Appeals was created by the act of 1693, to consist of one or more of the justices of the peace of each county with one or more of the governor's council. In the same year a Court of Oyer and Terminer was created, the judge to be named and " commissionated " by the governor, with the advice of the council, which judge, assisted by two or more justices of the county where the fact may arise, was given power to try such criminals as were accused of capital offences. *Leam. & Spi.* 514, 517, 553.

In the same year there was created a Supreme Court of Appeals, consisting of one or more of the justices of each county court, with one or more of the governor's council, any three of whom, one of whom should be of the council, should be a quorum. *Leam. & Spi.* 517.

In 1699 three judges, called " circular judges," and chosen yearly by the house of representatives, were substituted for the members of council. They were to sit with one or more of the justices of the peace of each county; and any two judges, with three justices of the peace, were to constitute a quorum.

The court was now called the Provincial Court, or Court of Appeals. *Leam. & Spi.* 563.

The instructions for Lord Cornbury, dated November 16th, 1702, contained no provision for any change in the courts, and in the forty-fifth paragraph he was directed not to erect any court or office of judicature not before erected or established without our special order. *Smith's New Jersey* 230; *2 N. J. Archives (1st series)* 506, 520; *Leam. & Spi,* tit. *"Grants and Concessions."*

By commission, dated December 5th, 1702, the queen granted to Lord Cornbury "full power and authority, with the advice and consent of the council, to erect, constitute and establish such and so many courts of judicature and public justice within the province as he and the council should think necessary for the hearing and determining of all causes, as well criminal as civil, according to law and equity, and for awarding execution thereon.    *    *    *    And do hereby authorize and empower you to constitute and appoint judges, and, in cases requisite, commissioners of Oyer and Terminer, justices of the peace, and other necessary magistrates in our said provinces, for the better administration of justice and putting the laws in execution." The power thus conferred was executed by the ordinance, which is without date, but which Mr. Justice Field refers to as the ordinance of 1704. *Lib. AAA of Commissions* 1, *Burlington; Field Prov. Courts; Collections of N. J. Hist. Soc., vol. III., App. B.*

In this ordinance, after establishing courts for the trial of small causes, Lord Cornbury provided that an appeal to the justices of the next Court of Sessions held for said county shall be allowed for, and any sum upwards of twenty shillings; he further directs "that there shall be kept and holden a Court of Common Pleas in each respective county at such place where the General Court of Sessions is usually held and kept, to begin immediately after the Sessions of the Peace does end and terminate, and there to hold and continue as long as there is any business, not exceeding three days;" he further provides "that the several and respective Courts of

Pleas thereby established should have power and jurisdiction to hear, try and finally determine all common-law actions, and provided an appeal."

The ordinance of 1723 was superseded by another of April 23d, 1724, and that in turn was superseded by an ordinance of August 21st, 1725, which was superseded afterwards by an ordinance of February 10th, 1728. The ordinance of 1723 was substantially reproduced in the latter ordinance. *Ordinances of 1723, Lib. AAA of Commissions* 184; 1 *Halst. App. A; Field Prov. Courts, App. D, E, F, G.*

The following represent all the references to that court in the organic law of this state:

Article 6, section 1, of the New Jersey constitution, reads as follows:

" The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes, as heretofore, a Court for the Trial of Impeachments, a Court of Chancery, a Prerogative Court, a Supreme Court, Circuit Courts, and such inferior courts as now exist and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish as the public good shall require."

Article 6, section 6, of the state constitution, reads as follows:

" There shall be no more than five judges of the Inferior Court of Common Pleas in each of the counties in this state, after the terms of the judges of said court now in office shall terminate; one judge for each county shall be appointed every year and no more, except to fill vacancies, which shall be for the unexpired term only."

Article 7, section 2, of the constitution of the state, reads as follows:

" 1. Justices of the Supreme Court, chancellor, judges of the Court of Errors and Appeals, and judges of the Inferior Court of Common Pleas, shall be nominated by the governor, and appointed by him with the advice and consent of the senate.

" The justices of the Supreme Court and chancellor shall hold their offices for the term of seven years; shall, at stated times, receive for their services a compensation which shall not be diminished during the term of their appointments.

" 2. Judges of the Courts of Common Pleas shall be appointed by the senate and general assembly in joint meeting; they shall hold their offices for five years; but when appointed to fill vacancies they shall hold for the unexpired term only."

Article 4, section 7, paragraph 10, of the constitution of the state, reads as follows:

" The legislature. may vest in the Circuit Courts or Courts of Common Pleas within the several counties of this state, Chancery powers, so far as relates to the foreclosure of mortgages and sale of mortgaged premises."

An examination of the provisions of the constitution respecting the Inferior Court of Common Pleas, in the light of the history of the court itself, leaves not the slightest doubt that it is one of the courts which the legislature may, at its volition, alter or abolish. It is in every sense an inferior court. It has original jurisdiction in civil cases, but in this is limited to those not involving the title to real estate.

From the date of the adoption of the constitution until the adoption of the constitution of 1844, no limit had been established to the number of the judges appointable in this court. The court itself was held by the justices of the peace of the county, the most inferior of all judicial officers in the state. 4 *N. J. Archives* 166.

" It is well known that for a considerable time in the history of this court the number of its judges was inordinate. In some counties there were thirty or more. To have had a full attendance of the whole, or the major part of the bench at such times, with a jury superadded, courts must, like town meetings, have been held outside of the average court-room, for want of room within." *Gray* v. *Bastedo,* 17 *Vroom* 453.

And throughout the constitution of 1844 the court is in terms declared to be the " Inferior Court of Common Pleas."

The adjudications of our courts, so far as the matter has there received consideration, have been uniform in regarding the Court of Common Pleas as an inferior court, and it has been expressly decided that its structure, as well as its jurisdiction, could be altered at the will of the legislature.

In the case of *Engeman* v. *State*, 25 *Vroom* 247, the question of the right of a justice of the Supreme Court to sit as a member of the Court of General Quarter Sessions of the Peace, and incidentally of the Court of Common Pleas, was considered.

Mr. Justice Van Syckel, in his opinion, says:

"In my judgment, the trial court in this case was legally constituted. In the next place, it is urged that the fourth section of the act of 1855, which makes justices of the Supreme Court *ex officio* judges of the Common Pleas, Orphans' Court and Quarter Sessions, is unconstitutional and void. The argument is as follows:

"By the constitution of 1844, section 6, it was provided that there should not be more than five judges of the Inferior Court of Common Pleas.

"Section 2, placitum 2, provided that judges of the Court of Common Pleas shall be appointed by the senate and general assembly in joint meeting.

"The act of 1855, in making a Supreme Court justice a judge of the Court of Common Pleas, virtually makes the appointment of a judicial officer unauthorized by and in conflict with the section of the constitution just cited. Under the constitution, a Common Pleas judge is appointed for five years, while a Supreme Court justice is appointed for seven years, and, by virtue of the act of 1855, a Supreme Court justice holds the term of a Common Pleas judge for seven years, despite the constitution.

"An obvious answer to this contention is that it is not open to controversy. It has been settled by a continued course of practice since 1855, recognized by the executive, legislative and judicial departments of the government and unchallenged by the bar, so far as the reported cases show. This rule was

applied by the Supreme Court of the United States in an early case, in which an effort was made to raise a question as to the jurisdiction of the Circuit Courts. *State* v. *Kelsey*, 15 *Vroom* 1. But if open to debate, it will be observed, in the first place, that the constitution gives the legislature the power to alter or abolish all these courts, as the public good shall require. The power to alter or abolish seems, necessarily, to imply and carry with it authority to change or modify the structure of the courts as well in the mode of appointment as in the number of their judges. In the second place, the constitution of the state provides no mode of selecting judges of the Court of General Quarter Sessions; nor does it fix their tenure of office. The clause relied on by the defendants relates only to judges of the Common Pleas. The power of the legislature, therefore, over the controverted subject, is unrestrained by the fundamental law, and the lawmaker, in that respect, is supreme. The validity of the act of 1855 cannot be successfully assailed."

In the case of *Central Railroad Co.* v. *Tunison*, 26 *Vroom* 561, Mr. Justice Van Syckel, in discussing the jurisdiction of the Circuit Court, after quoting the provisions of the constitution respecting them, says:

"The Circuit Court, like the Supreme Court, is unassailable by the legislative branch of the government in its jurisdiction. The constitution permits the inferior courts only to be altered or abolished. The jurisdiction of all the constitutional courts, by necessary implication, are established as they existed antecedently to the date of the constitution. * * * The Circuit Court is one of the courts of law which is protected in its jurisdiction by the express provisions of the organic law."

In the case of *Grey* v. *Bastedo*, 17 *Vroom* 453, Mr. Justice Knapp, in considering the question (whether the Inferior Court of Common Pleas in this state is legally organized for hearing and determining cases in the presence of one judge only), says: "The constitution adopted in July, 1776, section 12, provided that the justices of the Inferior Court of

Common Pleas in the several counties should continue in office five years. In October, 1776, an act was passed by the legislature providing ' that the several courts of law and equity in this state shall be confirmed and established and continue to be held with the like powers under the present government as they were held at and before the declaration of independence.' Up to this time and until the adoption of the new constitution in 1844, no limit had been established to the number of judges appointed in this court. Section 6, of article 6, of the new constitution declared that there should be no more than five judges of the Inferior Court of Common Pleas in each of the counties of this state after the terms of the judges of the said court shall terminate. This number, by legislation in 1855, was reduced to three in each county, exclusive of the justice of the Supreme Court. The long-established usage in this court is against the plaintiff's position. There has been no uniform practice in the court to require or have the presence of the whole, or a majority, or any specific number or proportion of the judges in attending upon its sessions."

In the case of *Jersey City* v. *Lembeck,* 4 *Stew. Eq.* 255, Mr. Chief Justice Beasley, in discussing the powers of the Court of Chancery in matters of municipal assessment, dwells upon the distinction between the constitutional courts and those which are not constitutional, vigorously denying to the legislature the power of interfering with the powers and prerogatives of the constitutional courts.

In the case of *Harris* v. *Vanderveer,* 6 *C. E. Gr.* 424, the right of the legislature to grant an appeal from the Prerogative Court to the Court of Errors was considered, and the Chief Justice there considers and properly defines the method in which the question of the constitutionality of an act is to be approached: " There are two primary principles which are always to be borne in mind in the discussion of every question touching the limitation of the authority of the legislature of the state. The first of these is, that the legislative body is supreme in every respect, except in the enumerated instances

of constitutional restraint; and, next, that such restraint cannot be imposed but by plain language, or by implication necessarily springing from the co-ordination of the several parts of the established system of government. It is evident, therefore, that the present motion cannot prevail, unless it can be made plain to the mind of the court that some provision of the constitution exists which prevents the assumption by the legislature of the authority to pass the act in question. In the opinion of the legislative and executive branches of the government, this power exists. That opinion is entitled to the utmost respect, and it can, with propriety, be superseded only when this court is convinced beyond a doubt that it is founded in error or misconception." See, also, in this connection, *Dufford* v. *Decue,* 2 *Vroom* 306.

In view of the history of the Court of Common Pleas, its position in the judicial system of the state, the statutory and constitutional provisions affecting it and the decisions fixing its character, it is submitted that there is no legal foundation for the application of the relator.

For the relator in reply, *Frederic W. Stevens.*

The Court of Common Pleas was established by an ordinance of Lord Cornbury in 1704, pursuant to the authority conferred upon him by his commission from Queen Anne, dated December 5th, 1702. *State* v. *Dufford,* 2 *Vroom* 303, 304. This ordinance was followed by one of Governor Hunter in 1714, and by another of Governor Burnet in 1723. These last-named ordinances, set out in the appendix to 1 *Halst.* 1, have been regarded as the foundation of the present jurisdiction of the court. 4 *Griff. L. R.* 1169. The court is made a constitutional court by the constitution of 1776, that instrument providing in section 12 for their appointment by the council and assembly in joint meeting, and for their term of office (five years).

As the royal ordinance fixed its powers and jurisdiction prior to 1776, and as the constitution established it after that time, it is apparent that for nearly a century and a half before

the adoption of the constitution of 1844, it was a court beyond legislative interference. It was a court, moreover, of extensive jurisdiction and authority.

It is claimed, however, that the constitution of 1844 has so changed the *status* of this court that it is now completely within legislative control.

The provisions of the constitution of 1844 seem to be a sufficient answer to this contention.

Article 6, section 6, reads as follows :

" There shall be no more than five judges of the Inferior Court of Common Pleas in each of the counties in this state, after the terms of the judges of said court now in office shall terminate. One judge for each county shall be appointed every year, and no more, except to fill vacancies, which shall be for the unexpired term only."

Article 7, section 2, reads as follows :

" Judges of the Inferior Court of Common Pleas shall be appointed by the senate and assembly in joint meeting."

It is thus plain that the constitution of 1844 continued the policy that had been adopted at the very beginning of the provincial government, and had remained unchanged for one hundred and fifty years. The court, after 1844, still remained a constitutional court—one in the case of which the judges were to be appointed by the senate and assembly in joint meeting.

But it is said that article 6, section 1, has so far modified the court constituted by the previous ordinances and by the constitution of 1776 as to authorize the legislature to alter or abolish it at pleasure.

The constitutional provision relied on is as follows :

" The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes as heretofore, a Court for the Trial of Impeachments, a Court of Chancery, a Prerogative Court, a Supreme Court, Circuit Courts, and such inferior courts as now exist and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish as the public good shall require."

But it is an elementary rule that all the provisions of a law or a constitution must be read together, and that that construction must be adopted which will harmonize the whole, making every word operative and none idle or nugatory. *Cooley Const. Lim.* \*58. With this rule in view it seems to me impossible to read article 6, section 1, and article 7, section 2, otherwise than as follows :

" The judicial power shall be vested in  *  *  *  such inferior courts as now exist and as may be hereafter ordained and established by law, which inferior courts the legislature may alter or abolish as the ' public good shall require,' provided, nevertheless, that 'judges of the Inferior Courts of Common Pleas shall be appointed by the senate and assembly in joint meeting.' "

This is so obviously the correct reading of the constitution in this particular that argument on the subject is hardly possible.

Conceding, for the purposes of the argument, that the power of the legislature to alter and abolish extends to those inferior courts which existed when the constitution was adopted, as well as to those which the legislature might thereafter have established (a proposition denied in my associate's brief), the matter would stand thus :

The legislature might abolish any inferior court, including, of course, the Court of Common Pleas. If they did so in substance as well as in mere semblance, of course no judges could be appointed. If they only altered the Court of Common Pleas, then, while they might change it in other respects, they could not, in the method of appointing the judges, because the constitution itself prescribed this method.

The question to be solved, then, is whether the act of 1895, chapter 162 (*N. J. L. J.* 104), as amended by chapter 325, and entitled "An act to abolish the Inferior Courts of Common Pleas, Courts of Oyer and Terminer and General Jail Delivery, and Courts of General Quarter Sessions of the Peace, and to establish in their place a County Court in each of the counties of this state, and to provide for and define the jurisdiction,

powers and duties of such County Courts," is an act which really abolishes the Court of Common Pleas.

I respectfully contend that the Court of Common Pleas, so far from being abolished by this act, is, in fact, continued with precisely the same jurisdiction, powers and duties—its name alone being changed to give color to the attempt of the legislature to evade the constitutional provisions above referred to.

It has been demonstrated by the argument on both sides that, at the time of the adoption of the constitution in 1844, the Court of Common Pleas had that fixed and certain jurisdiction which was impressed upon it by the ordinance of 1723.

Mr. Justice Van Syckel, in *Central Railroad Co.* v. *Tunison*, 26 *Vroom* 563, said: " The jurisdictions of all constitutional courts, by necessary implication, are established as they existed antecedently to the date of the constitution."

It was the court which possessed the jurisdiction, given to it by the ordinance of 1723, which the constitutional provision contained in article 7 was intended to protect—not the name. Is it not altogether obvious that if the legislature should have denominated the District Courts of the various cities of the state, Courts of Common Pleas for these cities, it could have made any provision for the appointment or election of the judges and the length of the term of their office, that it saw fit to make? And is it not equally obvious that if the legislature had seen fit merely to call the Court of Common Pleas known to the constitution, by some other name, it could not have provided for the appointment of its judges otherwise than as prescribed by the constitution? Could the legislature, by calling the sheriff or clerk by the name of marshal or prothonotary, and conferring upon him the same or concurrent powers, provide for his appointment in a mode different from that prescribed by the constitution for the sheriff or county clerk?

The Court of Appeals in New York has clearly enunciated the principle.

In *People* v. *Raymond*, 37 *N. Y.* *428, it is said : " It is not enough that the name of the office is changed, or the powers enlarged to authorize the legislature to confer upon the governor the appointment of officers," which the New York constitution had declared should be elected.

And in *People* v. *Albertson*, 55 *N. Y.* 55, it is said : " The constitution cannot be evaded by a change in the name of an office, nor can an office be divided and the duties assigned to two or more officers under different names, and the appointment to the offices made in any manner, except as authorized by the constitution."

In *Wenzler* v. *People*, 58 *N. Y.* 523, the court says : " The principle " (that the courts will look at the substance of an office named in the constitution and will not allow its provisions as to the mode of filling the office to be defeated by giving it a new name), " is both sound and salutary, but it has no application to the case before us. Its legitimate application is to cases where the legislature confers upon an office newly created a new name, coupled with duties belonging to an office in existence and provided for by constitutional requirements—for instance, an act creating a marshal of a county to be appointed by the governor and senate, and to perform the duties theretofore performed by the sheriff. Such an act would be an evasion of the constitution, and it would be rightly held that the office remained unchanged save in name, and could only be filled as the sheriff's office is required to be by the constitution. * * * To carry out this principle a constitutional provision will be construed largely so as to include all legislative acts within the mischief intended to be prevented."

Again, in *People* v. *Terry*, 108 *N. Y.* 10, it is said : " We think the officer named in the act, though called a justice of the peace, is not the officer named in the constitution and whose election is therein provided for. * * * It is not the name in such cases, but the jurisdiction of the court, which is material, and so long as that is inferior and local,

the name given to the person who is to preside in it, is not generally important, certainly not in this instance."

These authorities make it perfectly clear that what is protected by the constitution is not the name, but the jurisdiction designated or characterized by the name at the time when the constitutional provision took effect.

And they prove further, that neither by subtracting from nor adding to the duties of a given office, can the legislature acquire the power to appoint in a manner different from that prescribed by the constitution.

Now, the method by which the legislature, in the present instance, has attempted to evade the constitutional provision, is twofold—*first*, by merging the Court of Common Pleas with the Court of Quarter Sessions and Oyer and Terminer; *second*, by abolishing it in terms and then instantaneously reviving it under a new name. I respectfully insist that both of these subterfuges must fail.

As to the first: Who would contend that, by merging the offices of sheriff and coroner, or of county clerk and surrogate, and calling these offices by a different name, the legislature could change the mode of election prescribed by the constitution? And would the effort be more successful if, instead of seeking to merge two constitutional offices, the legislature should add to a constitutional office the duties of an office purely statutory? If the court once countenance any such procedure as this, what part of the framework of our government will be exempt from legislative invasion? An easy expedient will have been found to support any innovation, for, stripped of all disguises, the proposition contended for on this branch of the argument is, of necessity, this—that the method of appointing officers prescribed by the constitution need not be followed when the legislature imposes upon them the duties of another office. Will the court, for an instant, give its sanction to this novel doctrine? And yet it is precisely what is contended for. It is said that the legislature, by joining the office of judge of the Common Pleas to that of judge of the Quarter Sessions, has become vested with

authority to declare the office elective. If this can be done, why was the constitutional amendment of 1875 adopted? The people had become dissatisfied with the old mode of electing judges of the Common Pleas by the legislature in joint meeting, so they declared :

" Judges of the Inferior Court of Common Pleas shall be nominated by the governor and appointed by him, with the advice and consent of the senate."

Were the two successive legislatures who approved this amendment, and were the people, who in their sovereign capacity ordained it, guilty of the folly, first, of doing that which might have been done by statute merely, and, secondly, of doing it so ineffectually that their constitutional mandate could be overcome by resorting to a form of words by which the court was, in terms, merged with the Quarter Sessions, although there had been a practical merger so far as the judges were concerned, years before its adoption ?

The second contention of the defendant's counsel is that the Court of Common Pleas has been, in so many words, abolished by the act under review.

It has always seemed to me that this was the feeblest of all the arguments put forth in defence of this legislation. For the purpose of clearness, I will begin with the simplest illustration : Suppose the legislature had dealt only with the Common Pleas, and had declared that this court was abolished, and that all its jurisdiction was thereby vested in another court, to be called the Common Pleas, whose judges should be elected by the people, would the constitutional Court of Common Pleas have been thereby abolished, and would the new Court of Common Pleas have been a purely statutory tribunal, to be moulded entirely at the will of the legislature? I hardly imagine that anyone in his senses would so allege.

But, to go a step farther : Suppose that the legislature had passed an act declaring that the Court of Common Pleas was thereby abolished, and that all the jurisdiction thereof should be vested in another court, to be called the County Court, whose judges should be elected by the people, would the situa-

tion be at all changed ? Certainly not, unless the court should hold that the name was everything and the substance nothing, a proposition of which I have already shown the fallacy.

In each of the cases I have supposed, it will be perceived that precisely the same jurisdiction was continued with not even a momentary interruption ; that the legislature was careful to provide that, not even for an instant, should the jurisdiction and powers of the court cease. It was, all along, the same jurisdiction proceeding in the same way, guided by the same rules.

But the case which I last put is the very case provided for by the statute in question, complicated only by the additional device of a merger which, as I have already shown, adds nothing to the constitutional power of the legislature. By a form of words the Common Pleas, and consequently the jurisdiction of the Common Pleas, is in one breath abolished, while in the next it is instantly revived, and no break, even for an instant, allowed to interrupt the continuity of that jurisdiction which has extended uninterruptedly through two centuries. If this be not a mere juggle of words, it would be hard to devise one. The net result is a change in the name of the court, and an attempt to make the judge thereof an elective officer. Precisely the same legal result would have followed if the legislature had declared in terms that thereafter the Court of Common Pleas should be called the County Court, and that it should be presided over by one judge who should be elected by the people ; but then the evasion of the constitution would have been too transparent.

The case propounded to the justices by the Massachusetts Supreme Court, found in 117 *Mass.* 603, seems to be exactly in point.

The legislature submitted two questions :

1. Whether office of register of probate and insolvency could lawfully be abolished by the legislature.

2. Whether after the abolition of said office the legislature could lawfully establish the office of clerk of the Court of Probate and Insolvency, the incumbent whereof should have

and exercise all the powers and duties heretofore had and exercised by such register, and whether the legislature could confer upon the governor power to appoint such clerk.

The constitution required the legislature to prescribe by general law for the election by the people of register of probate, but left it to the legislature to prescribe the term of office, and did not otherwise restrict its power.

Held, that legislature might abolish the office, but that whether the officer were styled register or clerk, he must be elected by the people of the county. The case is doubly significant, because here it was held that the office might be abolished.

The following cases also bear upon the question under discussion. They are considered in my associate's brief: *People* v. *McKinney,* 52 *N. Y.* 378; *State* v. *Brunst,* 26 *Wis.* 412; *Commonwealth* v. *Gamble,* 62 *Pa. St.* 344; *Warner* v. *People,* 2 *Denio* 272, 281 (per Chancellor Walworth); *State* v. *Leonard,* 86 *Tenn.* 485.

The question involved in this case was not in issue in *Engeman* v. *State,* 25 *Vroom* 252; nor in *Central Railroad Co.* v. *Tunison,* 26 *Id.* 562. The latter case had to do only with the jurisdiction of the Circuit Court, which was held to be unassailable, by legislation, in the jurisdiction which they exercised at the adoption of the constitution, a decision, so far as it goes, favorable to the view for which I am contending. In the former case it was held quite consistently with my argument that the legislature might at its pleasure modify the constitution of the Court of Quarter Sessions. No case could better illustrate the distinction here involved. The court there ruled that the judges of the Quarter Sessions might be appointed in such manner and for such terms as the legislature saw fit to prescribe, for the obvious reason that their right to prescribe the manner of appointment was not fettered by any constitutional restriction. In the case now before the court the entire argument rests upon that clause of the constitution which, in declaring that the judges of the Common Pleas shall be appointed by the governor, does

impose such a restriction. The point here presented, therefore, was not then in anywise before the court for decision. It is true that counsel for the prisoner in that case, either with or without design, confounded the Quarter Sessions with the Common Pleas, but this does not make the decision any the more an authority for the position now contended for by the defendant. It rather indicates that the attention of court and counsel was not directed to the obvious and all-important distinction between the two cases. Counsel was there interested in showing that there was none, and the passage in the opinion, upon which counsel for defendant rest their case so largely, possesses, therefore, less significance than it would otherwise have, for had the attention of the justice been directed to the matter, he would have been careful not to have confounded two cases so obviously dissimilar, and would have more guardedly confined himself to the decision of the case then before him.

I respectfully submit, therefore, that the law is unconstitutional and void.

The opinion of the court was delivered by

VAN SYCKEL, J. The relator, who is one of the judges of the Court of Common Pleas of the county of Essex, asks for a *mandamus* commanding the clerk of Essex county to disregard the act of the legislature, passed March 14th, 1895, known as the County Court act.

A supplement was passed to the act, March 22d, 1895 (*Pamph. L., p.* 647), and on the 13th of June, 1895, the act embodying the supplement was again passed. *Pamph. L., p.* 807.

The relator claims that the act is unconstitutional, and bases his right to the mandatory writ upon that ground.

It is admitted that this is the proper proceeding, on the part of the relator, to test that question, and we are thereby relieved of the consideration of any technical question of procedure.

A case of such public importance, involving the powers of

a co-ordinate branch of the state government, as well as the due administration of public justice, is one which should not, under any urgency, be hastily decided.

The questions involved have, therefore, received careful and deliberate consideration.

The act which is assailed provides that the Inferior Courts of Common Pleas, Courts of Oyer and Terminer and General Jail Delivery, and Courts of General Quarter Sessions of the Peace, in and for the several counties of this state, be and they are thereby abolished, and that a County Court be established in each of the counties of this state, to be known and designated as the " County Court."

The judges of the court are to be members of the bar of this state, and are to be elected by popular vote.

The justices of the Supreme Court of this state, together with the judges to be elected under this act, are to be judges of the County Courts, and any County Court may be held by any justice of the Supreme Court, or by any judge of any of the County Courts, or by any such justice and judge sitting together.

The following are the provisions of the state constitution which bear upon the case:

" There shall be no more than five judges of the Inferior Court of Common Pleas in each of the counties of this state, after the terms of the judges of said court now in office shall terminate. One judge for each county shall be appointed every year, and no more, except to fill vacancies, which shall be for the unexpired term only."    *Const., art.* 6, § 6.

Article 7, section 2, is as follows:

"Judges of the Inferior Court of Common Pleas shall be appointed by the senate and assembly in joint meeting."

This was changed by an amendment to the constitution in 1875, as follows:

"Judges of the Inferior Court of Common Pleas shall be nominated by the governor and appointed by him, with the advice and consent of the senate."

Article 6, section 1, is as follows:

"The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes as heretofore, a Court for the Trial of Impeachments, a Court of Chancery, a Prerogative Court, a Supreme Court, Circuit Courts, and such inferior courts as now exist and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish as the public good shall require."

In view of these provisions of the fundamental law of the state, it is contended by the relator that it is not within the power of the lawmaker to deprive the governor of the right, under the constitution, to appoint, by and with the advice and consent of the senate, the judges of the County Court established by the act of 1895.

The case of *Engeman* v. *State*, 25 *Vroom* 247, does not control this controversy.

All that the Engeman case decided is, that a justice of the Supreme Court was qualified to preside in the trial of an indictment in the Passaic Quarter Sessions.

The fourth section of the act of 1855 expressly provides that justices of the Supreme Court shall be *ex officio* judges of the Common Pleas, Orphans' Court and Quarter Sessions.

The decision in the Engeman case was put upon the ground that the act of 1855 expressly provided that justices of the Supreme Court should be judges of the Quarter Sessions; that that provision was not superseded or repealed by any subsequent legislation; that its validity had been conceded by a continued course of practice since 1855, recognized by the executive, legislative and judicial departments of the government, and unchallenged by the bar, and that it was not open to controversy under the rule which had been applied by the Supreme Court of the United States in an early case, in which an effort was made to start a question as to the jurisdiction of the United States Circuit Courts. What was said in the opinion of the court with respect to the Common Pleas, the judge who delivered it was careful to qualify in the following language:

"The constitution of the state provides no mode of selecting judges of the Court of General Quarter Sessions, nor does it fix their tenure of office; the clause relied on by the defendants relates only to judges of the Common Pleas. The power of the legislature, therefore, over the controverted subject is unrestrained by the fundamental law, and the lawmaker in that respect is supreme."

It was not necessary to the decision of that case to consider whether a justice of the Supreme Court could, by an act of the legislature, be constituted a judge of the Court of Common Pleas. Conceding that he could not, there was no infirmity in the act of 1855, so far as it expressly provided that he should be, *ex officio*, a judge of the Quarter Sessions. I entertain now no doubt whatever that the Engeman case was well decided.

Nor can there be any question that the Court of Common Pleas may be altered in two respects—*first*, as to the number of its judges; and *secondly*, as to the qualifications of those judges.

If it is admitted that the legislature may extinguish that court, whenever, in its discretion, it deems that the public good requires it to be abolished, yet, in my judgment, so long as the court is substantially in existence, the provision of the constitution that "judges of the Inferior Court of Common Pleas shall be nominated by the governor and appointed by him, with the advice and consent of the senate," stands as an insurmountable barrier to the election of those judges by the people, or to their appointment in any way other than that thus prescribed.

The question in that case to be determined will be whether, according to the rule which should be applied to the exposition of the constitution, the Court of Common Pleas has lawfully been abolished by the "County Court" act.

In *Warner* v. *People*, 2 *Denio* 272, the Court of Errors of New York held that when the constitution provides for the appointment to an office in a particular manner, the legislature has no power to create a new office for the performance of the

same or the principal part of the same duties, and to direct the appointment to be made in another manner.

The constitution of New York required local officers to be elected by local constituencies.

In *People* v. *Draper*, 15 *N. Y.* 532, the Court of Appeals declared that "it is. not enough to take the case out of this provision of the constitution, that the names of the offices existing when the constitution was adopted are afterwards changed by an act of the legislature, or that their functions are colorably modified. ·The constitution regards substance, and not mere form."

In *People* v. *Raymond*, 37 *N. Y.* 428, the rule was strongly stated. In that case the constitution required city officers to be elected by the people. The legislature passed an act to authorize the governor to appoint commissioners to review taxation. The court found that the duties charged on the new commissioners were substantially the same as those which, at the adoption of the constitution, had been performed by city assessors, and that it was not enough that the name of the officer was changed or his powers enlarged, to authorize the legislature to confer such power of appointment upon the governor, and, therefore, the act was held to be futile.

In *People* v. *Albertson*, 55 *N. Y.* 57, Mr. Justice Allen, who delivered the opinion of the court, said : "The constitution cannot be evaded by a change in the name of an office, nor can an office be divided and the duties assigned to two or more officers under different names, and the appointment to the offices be made in any manner except as authorized by the constitution; and courts will scrutinize acts of the legislature, and see that the constitution is not evaded, and its intent frustrated by a mere colorable change in the designation and title or the duties of an officer, when the appointment is taken from the locality, and will hold the act void, unless the change is real and substantial." 117 *Mass.* 603 ; *State* v. *Brunst*, 26 *Wis.* 412, and *State* v. *Leonard*, 86 *Tenn.* 485, are like authorities, broadly upholding the same rule.

The rule to be extracted from these cases is wise, and it

will at once appear to laymen as clearly as to those learned in the law that it is absolutely essential to give any stability to constitutional guarantees.

The provision which the people embodied in their written constitution to secure permanency in the mode adopted by them for the appointment of these judges is impotent, if it can be evaded by changing the name of the court, or by altering or adding to the powers of its judges.

The substance of the court is not its name. It is individualized, and will be recognized by its jurisdiction and the powers its judges may exercise under the constitution and laws of the state.

It will be instructive, therefore, in the discussion of this case to compare the powers heretofore exercised by the judges of the Common Pleas with those granted to the judges to be elected under the County Court bill.

The Courts of Oyer and Terminer, Courts of Common Pleas and Courts of Quarter Sessions were in existence long prior to the adoption of the constitution.

The first constitution of this state, adopted in 1776, provided that judges of the Court of Common Pleas should be appointed by the council and assembly, and hold their office for the term of five years. No mode is prescribed in the constitution for appointing judges of the Oyer and Terminer and of the Quarter Sessions, and no judges have ever been chosen to sit exclusively as judges in either of these courts. Long before the adoption of the constitution of 1844, the legislature provided by statute that the judges of the Court of Common Pleas should be the judges of the Quarter Sessions, and that they should also be judges of the Oyer and Terminer. To constitute the latter court, the presence of a Supreme Court justice was necessary.

These statutes are still in force; they have never been repealed.

When the constitution was last amended, the judges of the Common Pleas sitting in the Quarter Sessions had power to try all criminal cases except treason, murder and man-

slaughter, and more recently the jurisdiction of the Sessions, in counties having a law judge, has been extended to cases of manslaughter.

By the sixth section of the act of June 13th, 1895, it is provided "that the County Courts in the several counties in the state shall have jurisdiction and cognizance of all crimes, misdemeanors and offences whatsoever which by the laws of this state are or shall be of an indictable or presentable nature, and which have been or shall be committed, done or attempted within the counties respectively, and of causes of civil and penal action arising therein; and the said County Courts shall have, and they and each of them are hereby invested with and may exercise all the jurisdiction, powers and authority heretofore conferred upon or lawfully exercised by any and all of the courts mentioned in the first section of this act (which are the Oyer and Terminer, Common Pleas and Quarter Sessions), both by way of original jurisdiction and on appeal; and for the purpose of properly hearing and determining the matters and causes of action committed to said County Courts in and by this act, and to facilitate the administration by said courts of the laws applicable to such matters and causes of action, it shall be lawful for said courts to proceed in the manner and according to the methods, rules and practice heretofore provided, established and prevailing in any of the courts hereby abolished, until such methods or practice shall be changed by rules, as provided in this act or otherwise, according to law; and all proceedings and acts had and taken before such County Courts shall be of the same validity, force and effect as if the same were had and taken prior to the passage of this act before the several Courts of Oyer and Terminer, General Quarter Sessions of the Peace and the Courts of Common Pleas of the state; and every judge of a County Court shall have and may exercise all the rights and powers which have heretofore been vested in or exercised by any judge or law judge or president or presiding judge, or by the judges of any of the said courts acting or sitting together, and shall perform all duties heretofore imposed on or required of any such judge

or judges; *provided*, that a justice of the Supreme Court shall preside at the trial of any presentment or indictment for a crime punishable with death."

The fifth section provides that the ministerial officers of the courts declared by the act to be abolished shall be the ministerial officers of said " County Court."

The eighth section provides that all suits and proceedings pending in the courts abolished, at the time the " County Court " assumes jurisdiction, shall be continued in the " County Court " as if originally commenced therein.

From this recital it appears that the jurisdiction and power committed by this act to the " County Court " differs in no substantial respect from that hitherto exercised by the judges of the Court of Common Pleas.

The infirmity in this legislation, according to the doctrine established by the cases cited, in my judgment, consists in the fact that it does not (notwithstanding the declaration to that effect in its first section) abolish the courts therein specified, but leaves the judicial machinery, except in name, substantially unaltered, while it provides a mode of electing the judges, inimical to the paramount law.

In fact, the bill with admirable care and circumspection preserves and perpetuates the existing *status* of our judicial system, so far as these courts are concerned, except as to mere form and name, and the current business in each court declared to be abolished flows smoothly on, without a ripple, under the new name of the court as if the act had not been passed.

The authorities to which reference has been made establish the doctrine that the legislature cannot, by adding to or subtracting from the duties of a given office, or by uniting one office to another, acquire the right to appoint in a manner other than that prescribed by the supreme law.

Admitting this, which the judiciary has so often asserted to be a sound and salutary doctrine, to be the law of this case, how can the fact that the Common Pleas is merged with the Sessions, confer upon the legislature the power to disregard the constitution in the mode of appointing judges? If it

does, then the legislature might create a new inferior court, and thereafter, by declaring that it should be merged with the Common Pleas under a new name, arrogate to itself the right to select its own mode of appointing the judges.

The right to appoint judges of the Common Pleas was at first lodged by the present constitution in the senate and assembly in joint meeting, and no way was known in which that power could be withdrawn, except by a constitutional amendment, which in 1875 transferred it to the governor, and it is now one of his prerogatives. The constitution furnishes slight support to it in his hands, if it can be wrested from him by such legislation.

If the legislature should provide that the Common Pleas shall, in addition to its present functions, have all the jurisdiction now exercised by the Quarter Sessions, could it be successfully maintained that legislation could change the method of creating its judges? In what respect would the case differ, if the legislature declared that the jurisdiction of the Common Pleas should be transferred to the Sessions, and that the two jurisdictions should be exercised under the name of the Quarter Sessions?

If we regard substance and not mere form, in neither case could judges, appointed in contravention of the provision of the fundamental law, be qualified to act.

The " County Court " bill would produce substantially the same results, except as to the mode of selecting the judges, if it consisted of a single section providing that hereafter there shall be but one judge of the Court of Common Pleas, who shall be a member of the bar of this state, and he may hold the Quarter Sessions and Oyer and Terminer, with or without the presence of the Supreme Court justice, in all cases except those punishable with death. Under such a bill the three courts would severally retain their names; under the " County Court " bill they are embraced under a single name. That is simply form and not substance. The judges would be the same, the jurisdiction the same, the ministerial officers

the same, and the mode of procedure the same. The conspicuous difference would be an elective judiciary.

An attempt to engraft that feature upon an act drawn in the form suggested would unhesitatingly be condemned as an encroachment upon the organic law.

The two bills would produce almost identical conditions, and if the sphere within which legislation is admissible is not circumscribed in the one case, it cannot be in the other; if it is in the one case, it must be in the other.

The provision authorizing the legislature to alter or abolish the inferior courts must be read with the clause prescribing the mode of appointing judges of the Common Pleas.

If we concede that the Court of Common Pleas may be abolished, then, in my judgment, the true interpretation of the language used, in order to give due significance to both of said clauses, is that the legislature may alter the Court of Common Pleas by reducing the number of its judges to any number less than five, and by prescribing the qualifications of such judges, and when the legislature shall conceive that there is no longer a requirement for the exercise of the judicial functions which have been committed to that court, it may pass an act declaring that the court is abolished, and then it will cease to be a part of our judicial system.

But so long as the constitution remains unchanged, and so long as the jurisdiction vested in that court, at the time of the adoption of the constitution and its amendments, is preserved for the benefit of the people, it must be exercised by a court, the judges of which are appointed as heretofore.

It was intended not merely to protect the name of the court, but to shield from successful assault by legislation the jurisdiction designated or characterized by the name of the court at the time the constitutional guarantee was adopted, so far at least as to forbid such jurisdiction to be transferred bodily, as it has been in this case, to be exercised by judges not appointed as the constitution prescribes. If to this limited extent there is not a restraint upon hostile legislation, these provisions are without the dominant quality of constitutional

guarantees, leaving the legislature free to do by indirection what it cannot do directly. The right to abolish gives absolute control, and these provisions are useless if our construction is not accepted.

Thus far this discussion has proceeded upon the assumption that the existence of the Court of Common Pleas has no stable foundation in the organic law of the state, a proposition which I cannot concede.

The language of the first section of article 6, above recited, is unquestionably broad enough to embrace the Common Pleas within the power given to the lawmaker to alter or abolish, and, if that section stood alone, no other interpretation could well be given to it.

But when we remember that there were, at the time the constitution was adopted, inferior courts other than the Common Pleas, to which that section clearly refers, namely, the Oyer and Terminer and the Quarter Sessions, and in that connection read two other clauses of the constitution, a very different question is presented.

The two clauses referred to are as follows:

*First.* "There shall be no more than five judges of the Inferior Court of Common Pleas in each of the counties of this state, after the terms of the judges of said court now in office shall terminate. One judge for each county shall be appointed every year, and no more, except to fill vacancies, which shall be for the unexpired term only."

*Second.* "Judges of the Inferior Court of Common Pleas shall be nominated by the governor and appointed by him, with the advice and consent of the senate."

Here we have provisions relating exclusively to the Common Pleas, providing the mode of appointing judges, their maximum number and their tenure of office, not susceptible of change by the legislature, and at the same time authority granted by clear implication to the legislature to reduce the number of judges and to say what their qualifications shall be

These specifications, designating clearly in what respects the Court of Common Pleas is above and beyond the reach

of legislation, and in what particulars it may be altered by legislation, justify and lead to the inference that it was not intended to be classed with the inferior courts, which the legislature has a general and unlimited power to alter or abolish under the first section of article 6.

The Common Pleas is placed on a higher plane than the other inferior courts, and it was the purpose of the constitution to give it a permanency and stability not secured to the Oyer and Terminer or the Quarter Sessions.

Why the provision pertaining to the Common Pleas alone was incorporated in the first constitution and preserved with additional sanctions in 1844, and why it was deemed necessary to resort to amendment of the constitution in 1875, to alter it, unless it was intended and understood that the court had a basis so deeply and securely laid in the supreme law that it could not otherwise be successfully assailed, I have been unable to perceive after most mature reflection.

If my judgment is at fault, a striking want of sagacity has been displayed by the framers of the constitution and the able jurists who have hitherto construed it.

For a century and a quarter this exposition of the constitution has been universally acquiesced in, so far that no attempt has, until the present time, been made by the legislature to assert its right, either to abolish the Court of Common Pleas or to change the method of selecting the judges who are to exercise the jurisdiction which resides in that court.

So pronounced has been the opinion of jurists that legislation in this respect is absolutely interdicted, that when the constitution was amended in 1875, and the clause giving to the governor the appointment of these judges was adopted without striking out the clause giving the power to the joint meeting of the legislature, the constitution was again attempted to be amended, to get rid of the earlier provision. It was not even suggested that the time and expense necessary to cure this omission could be saved by an act similar to the one now in question.

Under the view which has been taken of this subject, it

is not. deemed necessary to discuss the question whether the Common Pleas judges now in office can be legislated out of office before the expiration of the term for which they were appointed.

In my opinion, the act of 1895 is unconstitutional and void.

The relator, who legally holds the office. of judge of the Common Pleas of the county of Essex, is entitled to the mandatory writ of this court to restrain an illegal attempt, under the color of law, to elect a judge to supersede him.

Mr. Justice Lippincott concurs in this opinion.

MAGIE, J. (dissenting). After repeated and most careful consideration, I have found myself unable to agree with my associates in the conclusions they have arrived at in this case.

The question before us is, whether various acts of the legislature of 1895, purporting to abolish certain courts, including the Court of Common Pleas, and to establish in each county a new court, to be· called the County Court, were within the power of the legislature to enact.

Before a court can rightfully pronounce legislative acts invalid because of their opposition to the provisions of the constitution, such opposition ought to be clear and beyond doubt.

In the case before us, I have not found any clear and undoubted discrepancy between the acts complained of and the constitution. On the contrary, I think that giving to the pertinent clauses of the constitution a reasonable construction —such a construction as was almost contemporaneously given and acquiesced in and practiced under for over forty years and approved by a solemn adjudication of this court—the people thereby conferred upon the legislature power to pass the acts in question.

The courts affected by those acts are the Court of Oyer and Terminer and General Jail Delivery, the Court of General Quarter Sessions of the Peace and the Inferior Court of Common Pleas.

The first pertinent clause in the constitution is that contained in section 1, article 6, which reads as follows: "The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes as heretofore, a Court for the Trial of Impeachments, a Court of Chancery, a Prerogative Court, a Supreme Court, Circuit Courts, and such inferior courts as now exist and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish, as the public good shall require."

It is conceded that the Court of Oyer and Terminer and General Jail Delivery and the Court of General Quarter Sessions of the Peace, were, at the adoption of the constitution of 1844, inferior courts then existing, and that, by the clause above quoted, complete power was given to the legislature to alter or abolish them, when, in its judgment, the public good required.

Nor is there any serious contention that the Court of Common Pleas was not also an inferior court existing at the adoption of that constitution. It is true it was a court of great antiquity, having come down from provincial and colonial times. But it was always a court of limited jurisdiction and powers. It was always named in its records and pleadings as the "Inferior Court of Common Pleas." Such was the name given it in the constitution of July 2d, 1776, and in numerous acts of the legislature. And it was also so called in the constitution adopted in 1844. It not only was, but was then universally recognized as, an inferior court. To my mind, it does not admit of the least doubt that if the clause now under consideration stood alone, it conferred upon the legislature power over the Court of Common Pleas of equal extent and efficacy as that conferred in respect to other inferior courts. This proposition seems conceded by my associates.

But the claim is that the grant of power to alter and abolish the Inferior Court of Common Pleas conferred on the legislature by language the meaning of which it is impossible to mistake, is, by other clauses of the same constitution,

either wholly taken away or materially restrained and limited. It is here that my associates and I part company. In my judgment, the express power given to the legislature by this clause, over the Inferior Court of Common Pleas, is neither taken away nor diminished by any other part of that instrument.

The clauses to which my associates attribute this effect are the following, viz.: The two paragraphs of section 6, of article 6, which prescribe a limit on the number of the judges of the Inferior Court of Common Pleas, fix their term of office and provide for a commission which shall evidence their official *status*, and paragraph 2, of section 2, of article 7, which, as originally adopted in 1844, prescribed that such judges should be appointed by the senate and general assembly in joint meeting. One of the amendments to the constitution adopted in 1875, provided for the insertion in paragraph 1 of the last-named section (which paragraph required nomination and appointment by the governor with the advice and consent of the senate) of the words "and judges of the Inferior Court of Common Pleas." But by a singular inadvertence, paragraph 2, which provided for the appointment of such judges by the joint meeting of both houses of the legislature, was not stricken out of the constitution. An ineffectual attempt to strike it out was made in 1890, and the two clauses now stand in our constitution. But as the amendment of 1875 clearly expressed the people's intent that such judges should be nominated and appointed by the governor with the advice and consent of the senate, which appointment was incompatible with the mode provided by paragraph 2, subsequent governors and senates have properly treated the latter paragraph as repealed by implication.

The line of argument, then, is that while the constitution, by express terms, incapable in themselves of any other construction, has conferred upon the legislature power to alter or abolish the Inferior Court of Common Pleas when, in its judgment, the public good requires, yet that, by the clauses

of the constitution providing for the mode of appointment, &c., of the judges of that court, the granted power is either wholly taken away or so restrained and limited as to prevent the legislature from transferring the jurisdiction and functions of that court to any other court or to judges appointed in any other mode.

The rule of construction to be applied in such cases is free from doubt. That rule is that, while the whole instrument is to be examined and considered in determining the construction to be given to any part, yet if a part of the instrument, by express and unmistakable words, grants a power, such grant must not be construed as defeated, or even limited in its operation by other clauses of the same instrument, unless the latter are wholly incompatible with the unrestricted grant. If they can reasonably be construed in harmony with the grant, such construction must be given them, so that the grant may have its full effect.

I find no difficulty in construing these clauses of the constitution so as to preserve the power granted to the legislature to alter or abolish the Inferior Court of Common Pleas unimpaired and unlimited. That court, being in existence at the adoption of the constitution of 1844, was impliedly continued with its powers and jurisdiction until the legislature should deem the public good required its alteration or abolition. Until that time arrived, the judges of that court were to be appointed in the prescribed manner. When the legislature should exercise its power to alter or abolish the court, and its act left no office of a judge of that court existing, then the other clauses providing for their appointment would cease to be operative. The office being gone, no appointment could be made.

But it is said that it is unreasonable to conceive that the people, in adopting the constitution of 1844 and the amendment of 1875, meant to prescribe a mode of appointment of these judges, which the legislature might at any time make nugatory by the alteration or abolition of the court. But let us see into what a dilemma we are led by adopting the con-

trary view. When the people conferred on the legislature power to alter or abolish this court, we are to presume that they meant what they said. Nor was this a mere permission to the legislature. It obviously contained an implied mandate to alter or abolish the court when the legislature should deem the public good required. Surely, it is infinitely more reasonable to presume that the people intended to limit the prescribed appointment to the duration of the court, which leaves this mandate in full force, than to conceive that, by prescribing the appointment, they intended to deprive the mandate of all force, for I think it must be admitted that the construction adopted by my associates does, in fact, deprive the legislature of all power to alter or abolish this court. If these judges must be continually appointed, with the functions and jurisdiction previously possessed, then the legislature cannot possess the control over this court which the constitution intended, and it must remain unchanged, even if the legislature adjudges that the public good required alteration or abolition. If the legislature is restricted to a mere abolition of the court, without power to transfer its functions to another court, then the power apparently granted can never be exercised. The Inferior Court of Common Pleas possesses some concurrent jurisdiction. Upon its abolition, matters falling within that jurisdiction could doubtless be dealt with by other courts. But it also possesses a jurisdiction in many matters which is peculiar to itself and exclusive. In this jurisdiction is included, among other things, the power to lay out roads, to license inns and to hear and determine appeals from justices' courts. If these peculiar functions, of such public importance, cannot be transferred to and placed within the jurisdiction of other courts, it is obvious that the public good could never require its abolition. It becomes practically unassailable, and the granted power to abolish is nugatory and of no value.

It is also said in the same line that, admitting the power of the legislature to abolish this court, the acts now before us are an evasive exercise of that power. The contention is that

the Inferior Court of Common Pleas is thereby continued, with its previous jurisdiction, to be exercised under a new name by judges appointed in a different manner from that required by the constitution. This is said to be evasive of the constitution in that regard. But this argument, as well as that before alluded to, omits to recognize that the grant of power to the legislature is not only to abolish, but to alter. If the legislation in question does, as is claimed, abolish the Inferior Court of Common Pleas and create and establish a court of wider jurisdiction, then, in my judgment, it can be supported, under the legislative power to abolish that court. But if it continues the jurisdiction of the Inferior Court of Common Pleas to be exercised by another judge, appointed in a different mode, it is not evasive legislation, but a proper exercise of the legislative power to alter that court.

The reasoning of my associates must necessarily lead to the conclusion that the clause of the constitution in question does not empower the legislature to alter the Inferior Court of Common Pleas, in its judges and their mode of appointment. But such a conclusion is at variance with a construction of this clause almost contemporaneous with its adoption by the people, and which has been acquiesced in and acted upon for so long a period that, in my judgment, it ought not to be departed from.

By the act entitled "An act to reorganize the courts of law," approved February 9th, 1855 (*Pamph. L., p.* 17), it was, among other things, enacted that the justices of this court should be *ex officio* judges of the Inferior Court of Common Pleas. At that time the constitution prescribed that judges of that court should be appointed by the senate and general assembly in joint meeting. It is obvious that in this respect that act can only be sustained upon the construction I have given to the constitutional clause conferring power on the legislature to alter the Inferior Court of Common Pleas. It injected into that court judges who were not appointed in the manner prescribed by the constitution. It was a legislative construction of the clause of the constitution and contained

an assertion of their power to thus alter the court. That act remains unrepealed, and its provisions were re-enacted in the late Revision as section 26 of the "Act relative to the Supreme and Circuit Courts." *Rev., p.* 219. For over forty years it has been acquiesced in and acted upon. Every judge who has sat upon this bench since 1855, has, at times, sat in the Court of Common Pleas and exercised the jurisdiction of a judge of that court. In my judgment, it is too late to adopt a different and opposite construction.

Moreover, I think the constitutionality of the act of February 9th, 1855 (*supra*), in respect to the provision making justices of this court *ex officio* judges of the Inferior Court of Common Pleas, has been settled in this court by its decision in *Engeman* v. *State,* 25 *Vroom* 247. One of the questions in that case was whether a Court of General Quarter Sessions, held by a justice of this court and a lay judge of the Court of Common Pleas, was properly constituted and competent to try an indictment. The act of February 9th, 1855, had also made the justices of the Supreme Court *ex officio* judges of the Court of General Quarter Sessions of the Peace. As has been stated, there can be no question that the legislature had power to thus alter that court. But the legislature which clothed the justices of this court with the functions of the judges of the General Quarter Sessions, might deprive them of those functions or restrict them in their use.

By section 23 of the Criminal Procedure act (*Rev., p.* 270) it was enacted that the Court of General Quarter Sessions in each county should be constituted by any two or more of the judges of the Court of Common Pleas. The act of April 24th, 1887, re-enacted this section. *Pamph. L., p.* 133. Therefore, unless the justice of this court who sat in the trial of the Engeman case was a judge of the Court of Common Pleas, the trial court was defectively constituted. The justice of this court was a judge of the Court of Common Pleas only if the act of February 9th, 1855, was a valid exercise of legislative power. That was a question raised, and, as the opinion shows, considered. The decision sustained the

conviction as before a properly-constituted court, and thus settled that the justices of this court are properly *ex officio* judges of the Court of Common Pleas under the provisions of that act.

For these reasons I am unable to agree with my associates. In my judgment, the legislation attacked in this case ought to be held to have been within the power of the legislature to enact, and the *mandamus* should be denied.