GEORGE H. ENGEMAN, WILLIAM A. ENGEMAN, JOHN J. ENGEMAN ET AL. v. THE STATE.

1. A justice of the Supreme Court and any one of the judges of the Court of Common Pleas may lawfully hold the Quarter Sessions in counties in which there is a law judge of the Common Pleas.

2. The act of 1855 (*Pamph. L., p. 17*), which makes the justices of the Supreme Court *ex officio* judges of the Common Pleas, Orphans' Court and Quarter Sessions, is constitutional.

3. The record in this case is as follows: It recites the caption which states—"That by the grand inquest it is presented in manner and form following, to wit, the bills herewith presented are true bills." Then follows the bill on which the defendants were convicted. *Held,* that this record shows that the said indictment is one of the bills presented by the grand jury.

4. The caption states that the jurors were sworn, affirmed and charged to inquire, and does not set out that those affirmed were conscientiously scrupulous of taking an oath. *Held* that, since the passage of the fifty-third section of the Criminal Procedure act, this objection comes too late to prevail.

5. The record is: "That the said indictment and proceedings are handed down to the Quarter Sessions, there to be proceeded with according to law." *Held,* that this is sufficient to give the Quarter Sessions jurisdiction. The words "handed down" and "ordered to be delivered" are convertible terms.

6. There is no error in the charge of the court that the defendants who participated in conducting the disorderly house were guilty of the offence of keeping a disorderly house. In misdemeanors, all who aid, abet or participate are principals, and all equally guilty. If they would escape the penalty denounced against the crime, they must cease to act in complicity as soon as they have knowledge of the criminal character of their conduct.

7. The court has the right to settle what the practice shall be as to the time when requests to charge the jury shall be made, and parties must conform thereto.

---

On indictment for keeping disorderly house.   In error.

Argued at June Term, 1891, before BEASLEY, CHIEF·
JUSTICE, and Justices VAN SYCKEL and KNAPP.

For the plaintiffs in error, *Robert I. Hopper* and *Samuel
Kalisch.*

For the state, *William B. Gourley.*

The opinion of the court was delivered by

VAN SYCKEL, J.   The defendants were convicted in the
Passaic County Quarter Sessions for having kept a disorderly
house at Clifton, in said county, where betting on horse races
was habitually carried on.   The judgment of the trial court
is in this court by writ of error for review.

The case was tried in the Quarter Sessions before Mr. Jus-
tice Dixon and Judge Inglis, one of the judges of the Com-
mon Pleas of Passaic county, in the absence of the law judge
of said county.

The reason chiefly relied upon for reversal is, that the court
so constituted had no jurisdiction ; that by virtue of the act
of 1887 (*Pamph. L.,* p. 133), the law judge of the county
should have been present as a member of said court, even if
the justice of the Supreme Court were presiding.

The act of 1887 provides " that any two of the judges of
the Inferior Court of Common Pleas in each county of this
state may hold the Court of Common Pleas, the Orphans'
Court and the Court of General Quarter Sessions of the
Peace; provided, that in those counties having a law judge as
president judge such judge shall be present as a member of
said court."   Section 2 is a general repealer.

In 1855 an act was passed entitled "An act to reorganize
the courts of law."   *Pamph. L.,* p. 17.

By the fourth section of that act it is provided that the
justices of the Supreme Court shall be *ex officio* judges of the
Inferior Court of Common Pleas and Orphans' Court and
Court of General Quarter Sessions of the Peace of the sev-
eral counties, and the justice holding the Circuit Court in any

county shall be the president judge of said several courts. *Rev.*, *p.* 219, *pl.* 42.

By section 5 of the same act, it is provided that there shall be no more than three judges of the Inferior Court of Common Pleas, exclusive of the justice of the Supreme Court; and any two of the judges may hold the Court of Quarter Sessions. *Rev.*, *p.* 221, *pl.* 59.

This act authorizes any two of the judges to hold the Quarter Sessions.

An act passed in 1871 to facilitate judicial proceedings in the county of Passaic provides:

" That hereafter there shall be four judges of the Court of Common Pleas in addition to the justice of the Supreme Court holding the Circuit, one of which judges shall be a counselor at law, and any two of said judges, or one of said judges with the justice of the Supreme Court, may hold the Inferior Court of Common Pleas, the Court of General Quarter Sessions of the Peace. and the Orphans' Court of said county, and such additional judge by this act provided for shall be president judge of said courts whenever the justice of the Supreme Court shall be absent." *Pamph. L.*, *p.* 925.

This act expressly empowers the justice of the Supreme Court and one of the judges of the Common Pleas to hold the Quarter Sessions. If there had been no special legislation for Passaic county the same power would have existed under the law of 1855 before referred to.

Section 23 of the Criminal Procedure act (*Rev.*, *p.* 270) provides that:

"Any two or more of the judges, for the time being, of the Court of Common Pleas of any county in this state shall constitute a Court of General Quarter Sessions of the Peace in and for such county; provided, that in those counties having a law judge as president judge, such judge shall be present as a member of said court."

This provision in section 23 relates to the constitution of the court when the Supreme Court justice is not present, and it does not repeal either the aforesaid act of 1871 or the forty-

second section of the act relating to courts. *Rev., p.* 219. The twenty-third section of the Criminal Procedure act and the forty-second section of the act relating to courts are parts of the revision; both provisions were retained, and were intended to be retained, in our judicial system; they can be reasonably construed so that both shall stand, and the former neither repeals nor affects the latter. The provision that the justice of the Supreme Court, when present, shall be president judge of the Quarter Sessions, and that he may hold the said court with any one judge of the Common Pleas stands unimpaired. There is no necessary conflict between the laws which authorize such justice and one of the judges of the Common Pleas to hold the Quarter Sessions and the twenty-third section of the Criminal Procedure act.

That section has no reference to the constitution of the court, when the Supreme Court justice is in attendance; it in terms relates to the judges of the Court of Common Pleas, and provides how they may constitute a Court of Quarter Sessions. All that the language of the twenty-third section requires is, that when the court is held by judges appointed as Common Pleas judges, the law judge shall be present. The rule of law is axiomatic, that if by any reasonable interpretation both statutes can be upheld, the latter will not operate to repeal the former. *Britton* v. *Blake,* 6 *Vroom* 208.

In *Patterson* v. *The State,* decided in this court at June Term, 1886, and reported in 19 *Vroom* 381, it was held that the presence of three judges was necessary to constitute the Court of Common Pleas in Monmouth county. This rendered further legislation necessary in order to secure uniformity in the constitution of the court throughout the state, and led to the passage of the act of 1887 before set forth. This act is in the language of the twenty-third section of the Criminal Procedure act, and must receive the same interpretation hereinbefore given to the said twenty-third section. It has no reference to the constitution of these inferior courts when the justice of the Supreme Court is present. I entertain no doubt, that under the statutes to which reference has been made, the justice

of the Supreme Court may, with any one of the Common Pleas judges, lawfully hold the Quarter Sessions. But if the previous legislation did not justify that conclusion, the act of 1888 (*Pamph. L., p.* 64), made the court, as constituted below, a legal tribunal. That act provides : " That in case of absence, sickness or other inability, or vacancy in the office of the law or president judge of any county in this state, to sit or perform the duties of his office, it shall be lawful for the Chief Justice or any associate justice of the Supreme Court, if he shall be unable to perform the duties himself, which he is hereby authorized and required to do, to designate the law judge of another county to perform them."

This act clearly recognizes the right of the Supreme Court justice to preside in these inferior courts, not merely in the discharge of a temporary duty in an emergency, but at all times, in virtue of his office to hold said courts as constituted in this case. If, however, a narrower view be taken of this act, the result will not be changed. The record states that the trial was had before Justice Dixon and Judge Inglis. Assuming, as we must, that the record is verity, the inference is, and it will be presumed, that no other Common Pleas judge was present, and therefore the law judge was absent, and the case is within the act of 1888. It is not necessary that the Supreme Court justice, before he may proceed with the business in these courts, shall institute a judicial inquiry to ascertain why the law judge is not in attendance. Absence in this act means non-presence in the courts ; when the law judge is temporarily away, he must be presumed to be away by reason of some inability to attend, and he is absent in the statutory sense. *Fritts* v. *Kuhl,* 22 *Vroom* 191, 207. The maxim that all things will be presumed to be rightly done applies to these courts.

In my judgment, the trial court in this case was legally constituted.

In the next place, it is urged that the fourth section of the act of 1855, which makes justices of the Supreme Court *ex-*

*officio* judges of the Common Pleas, Orphans' Court and Quarter Sessions is unconstitutional and void.

The argument is as follows:

"By the constitution of 1844, section VI., it was provided that there should not be more than five judges of the Inferior Court of Common Pleas.

"Section II., placitum 2, provided that judges of the Court of Common Pleas shall be appointed by the senate and general assembly in joint meeting.

"The act of 1855, in making a Supreme Court justice a judge of the Court of Common Pleas, virtually makes the appointment of a judicial officer, unauthorized by and in conflict with the section of the constitution just cited. Under the constitution a Common Pleas judge is appointed for five years, while a Supreme Court justice is appointed for seven years, and by virtue of the act of 1855 a Supreme Court justice holds the term of a Common Pleas judge for seven years despite the constitution."

An obvious answer to this contention is, that it is not open to controversy. It has been settled by a continued course of practice since 1855, recognized by the executive, legislative and judicial departments of the government, and unchallenged by the bar so far as the reported cases show. This rule was applied by the Supreme Court of the United States in an early case, in which an effort was made to raise a question as to the jurisdiction of the Circuit Courts. *State* v. *Kelsey*, 15 *Vroom* 1.

But, if open to debate, it will be observed, in the first place, that the constitution gives the legislature the power to alter or abolish all these courts, as the public good shall require. The power to alter or abolish seems necessarily to imply and carry with it authority to change or modify the structure of the courts, as well in the mode of appointment as in the number of their judges.

In the second place, the constitution of the state provides no mode of selecting judges of the Court of General Quarter Sessions, nor does it fix their tenure of office; the clause relied

on by the defendants relates only to judges of the Common Pleas.

The power of the legislature, therefore, over the controverted subject is unrestrained by the fundamental law, and the law-maker in that respect is supreme. The validity of the act of 1855 cannot be successfully assailed.

*Thirdly.* It is objected that the record does not show that the indictment was one of the bills presented by the grand jury.

The record is as follows: It recites the caption, which states "that by the grand inquest it is presented in manner and form following, to wit, the bills herewith presented are true bills." Then follows the bill on which the defendants are convicted.

The interpolation of the words, "the bills herewith presented are true bills," does not extinguish the force of the previous language expressly referring to the indictment, which immediately follows in the record. The caption must be read in connection with the bill.

In *Cruiser* v. *State*, 3 *Harr.* 206, the caption read: "The foregoing bills of indictment are true bills." This the court said was a fatal defect, because it did not appear on the record that the bill set out was one of the "foregoing bills." The report does not show whether there was anything on the face of the record, as in this case, by which the bill appeared to have been found by the grand jury. The interpolation may be read in parenthesis or it may be regarded as surplusage.

*Fourthly.* Error is assigned on the ground that the caption states that the jurors were sworn, affirmed and charged to inquire, and does not set out that those affirmed were conscientiously scrupulous of taking an oath. *State* v. *Harris*, 2 *Halst.* 361 ; *State* v. *Fox*, 4 *Id.* 244.

These cases hold that when an indictment purports to be on the affirmation of some grand jurors, it must appear that they allege themselves conscientiously scrupulous of taking the oath. In both these cases the indictments were removed into the Supreme Court by *certiorari*, and motion made to quash before trial. Since those cases were decided, the fifty-third

section of the Criminal Procedure act has been enacted, providing that every objection to any indictment for any defect of form or substance apparent on the face thereof shall be taken by demurrer, or motion to quash before the jury shall be sworn and not after. The objection comes too late, and now it will be presumed that all things were rightly done, and that amendment would have been made in accordance with the fact if the objection had been interposed before the trial court.

*Fifthly.* It is alleged that the Quarter Sessions had no jurisdiction, because it does not appear by the record that the indictment, upon which the defendants were tried, was ordered by the Court of Oyer and Terminer, in which it was found, to be delivered to the Quarter Sessions, nor that it was filed and entered in the court as directed by the thirty-first section of the Criminal Procedure act.

The record is : " That the said indictment and proceedings are handed down to the Quarter Sessions, there to be proceeded with according to law," &c.

The words " handed down " are used in the " act to facilitate judicial proceedings in the county of Passaic " (*Pamph. L.* 1871, *p.* 925), which provides that " indictments may be ' handed down ' by the Oyer and Terminer into and be tried in the Sessions." " Handed down " and " ordered to be delivered " are convertible terms, and either form is sufficient to show that the trial of the indictment is committed to the inferior court. The rule applicable to special tribunals does not apply to the Quarter Sessions. The Sessions is not an inferior court in the sense that it must in all respects show its jurisdiction. *Gray* v. *Bastedo*, 17 *Vroom* 453.

The defendants on the trial excepted to the charge of the court.

The evidence was undisputed that at the Clifton race track, which was the nuisance complained of, bookmaking and betting were publicly and openly carried on during the races from January to April, 1889, and from October, 1889, to April, 1890, in presence of a large gathering of people, who congregated there and participated in the betting.

It was the uncontroverted fact that George H. Engeman was the president of the racing association, William A. Engeman the vice president, the defendant Battersby the treasurer, the defendant Sass the secretary, and that the property on which the illegal practices were carried on was owned by the three Engemans, the defendants.

The trial judge charged the jury that such practices made the establishment a disorderly house, and the question was "whether the defendants maintained it. That it made no difference whether they maintained it through the form of an association, or a corporation, or a partnership, or any other way, the question was, did they maintain it?

"Was there anything to show that the owners of the property had not entire control of it? What was there in the case to show that the Engemans could not go there and tear down the present structure and erect what structure upon it they chose? What was there to indicate that anything was maintained there except by their concert and consent? Now, it is undoubtedly the law, that the landlord becomes responsible for the maintenance of a disorderly house by his tenant, if he has rented the establishment to the tenant to be kept as a disorderly house, or with the anticipation upon his part that it would be so kept. Now, then, how did those bookmakers, who were actually engaged in the betting ring from day to day, get their rights there? According to a part of the testimony, Mr. Primrose goes around and collects each day from them so much for each booth. There is nothing there to indicate that they did not receive their rights daily, and if they received their rights daily, paying for them daily, what is there to indicate that the owners of the property, the Engemans, are not the landlords for whom Mr. Primrose is collecting the daily rent? Then the question would be, does the evidence show that the Engemans knew the property was being used in that way, and with that knowledge did they, day after day, let it to the bookmakers? If so, then under the law, undoubtedly, they are guilty of maintaining a disorderly house which the bookmakers themselves are engaged

in maintaining. It appears that there was an association there, whether a corporation or not, it does not appear, and it is said that George Engeman is the president of the association,. William Engeman is the vice president, Battersby the treasurer and Sass the secretary. If that association be maintaining this disorderly house and these gentlemen are the executive officers and active managers of that association, why, then, in the eye of the law, they are maintaining it, so that then the question is just there, whether the evidence satisfies you that these are the persons who maintained this disorderly house, or this place as a common resort for unlawful practices."

In all respects this charge is correct.

In misdemeanors all who aid, abet or participate are principals, and all are equally guilty. One who aids in carrying on a business which is conducted to his knowledge openly and flagrantly in violation of the criminal laws of the state, is amenable to the punishment which the law denounces against the offence. If he would escape the penalty, he must cease to act in complicity with those who defy the laws of the land, as soon as he has knowledge of the criminal character of their conduct.

To nuisance this doctrine has been frequently applied in those cases in which an agent sets up as a defence that he acted only for another, who is the real actor, controlling and enjoying the profits of the concern, but in which the agent is nevertheless held responsible. 2 *Whart. Cr. L.,* § 2374.

In *Commonwealth* v. *Gannett,* 1 *Allen* 7, Chief Justice Bigelow held that it was sufficient to support an indictment for keeping a disorderly house, if the defendant has only aided and assisted others in keeping the same.

In *Commonwealth* v. *Mann,* 4 *Gray* 213, a conviction was upheld where the trial judge left it to the jury to decide whether the defendant, with a knowledge of the doing by others of the acts which constituted a nuisance, aided, promoted and encouraged those acts.

That all who are personally concerned in keeping a disorderly house are chargeable as participants in the crime, has

abundant authority to support it.  *Commonwealth* v. *Tryon,* 99 *Mass.* 442 ; *Commonwealth* v. *Kimball,* 105 *Id.* 465 ; *Lowenstein* v. *People,* 54 *Barb.* 299.

After the jury had received the charge of the court and retired to consider of their verdict, counsel for the defendants made a number of requests to charge.  The court refused to recall the jury, stating that the established practice in that court was, that requests to charge must be made before the jury retired.

The regulation of the practice in that respect is within the discretion of the trial court, and parties and their counsel must conform to it.  No error can, therefore, be assigned upon the refusal to charge these requests.  It may, however, be remarked that the request was too broad, and that no error is apparent in the refusal to charge as requested, assuming that the request had been interposed in season.

Since the court of last resort has pronounced its judgment in the recent case of the State *v.* Haring, affirming the judgment of this court in that case, it is unnecessary to discuss any other reason assigned for reversal.

The judgment below should be affirmed.