B. S. HUTCHINS, Appellant, v. CITY OF DES MOINES et al., Appellees, P. J. MILLS, Intervener, Appellant.

MUNICIPAL CORPORATIONS: Bonds—Authorization—''General,''
1   ''Muncipal,'' and ''Special'' Elections.   The term ''election,'' whether general or city or municipal, has reference *to the choice of officers* alone.  (Secs. 1088, 1089, Code, 1897.)   Therefore, the clause ''last preceding municipal election,'' as it appears in Sec. 1306-e, Code Supp., 1913, fixing the extent of the affirmative vote sufficient to authorize the issuance of municipal bonds for the purchase of waterworks, means and refers solely to ''last preceding municipal election'' *at which officers are chosen*.

CONSTITUTIONAL LAW:   Distribution of Powers—Temporary
2   Judicial Tribunals.   The legislature has plenary power (a) to create a temporary, but distinct, subordinate judicial tribunal to ascertain the damages consequent on the taking, in a particular instance, of private property for a public use, and (b) to require district judges to perform the duties devolving on such tribunal. (Sec. 1, Art. 3, Const. of Iowa.)   So held in sustaining the constitutionality of Sec. 722-a, Code Supp., 1913, which creates such a tribunal for the ascertainment of the damages consequent on the condemnation by cities of privately owned waterworks.

CONSTITUTIONAL LAW:   District Judges—Ineligibility to Office.
3   The assignment, under authorization of statute, of a district judge to membership on a temporary, but distinct, subordinate judicial

tribunal, charged with the duty of ascertaining, in a particular instance, the damages consequent on the taking of private property for public use, is not inimical to Sec. 5, Art. 5, of the Constitution of Iowa, declaring such judge "ineligible to any other office . . . during the term for which he was elected." Such assignment simply works the imposition on such judge, *as district judge*, of specific, additional, judicial duties—duties preliminary and advisory to the work of the trial court.

**CONSTITUTIONAL LAW:  District Judges—Ineligibility to Office**

4   **—Appointment.** The *assignment* by the Supreme Court, under authority of statute, of a district judge to membership on a temporary, distinct, subordinate judicial tribunal, charged with the duty of ascertaining, in a particular instance, the damages consequent on the taking of private property for public use, *is not an appointment to office* and inimical to Sec. 5, Art. 5, Constitution of Iowa, declaring such judge "ineligible to any other office . . . during the term for which he was elected."

**CONSTITUTIONAL LAW:  Distribution of Powers—Appointments**

5   **by Judiciary.** The legislature may constitutionally authorize the Supreme Court to select the membership of subordinate *judicial* tribunals, the power *to appoint* not being essentially and exclusively an *executive* function. (Art. 3, Sec. 1, Const.)  So held in construing the act (Sec. 722-a, Code Supp., 1913) authorizing the Supreme Court to assign district judges to membership on a court of condemnation of waterworks.

**CONSTITUTIONAL LAW:  Distribution of Powers—Supervising**

6   **Power of Supreme Court.** The broad powers vested in the Supreme Court by Sec. 4, Art. 5, of the Constitution of Iowa, "to exercise a supervisory control over all inferior judicial tribunals," are ample justification for an act of the legislature authorizing said court to select the membership of a subordinate judicial tribunal charged with the duty of ascertaining the damages consequent on the taking of private property for public use.  And this is true irrespective of any technical legal discussion as to whether the power *to appoint* is or is not essentially and inherently executive in its nature.

*Appeal from Polk District Court.*—HUBERT UTTERBACK,
Judge.

SATURDAY, MAY 6, 1916.

ON JUNE 19, 1911, there was submitted to the voters of Des Moines at a special election this proposition: "Shall the

city of Des Moines purchase, establish, erect, maintain, and operate waterworks with all necessary reservoirs, mains, filters, streams, trenches, pipes, drains, machines, apparatus, and other requirements of waterworks plant or system?'' 3,330 votes were cast for the proposition, and 442 against. The city, on October 2d following, adopted the resolution that ''The city of Des Moines do now proceed to acquire by condemnation, as provided by Chapter 45 of the Acts of the 33rd General Assembly as amended by the Acts of the 34th General Assembly, the said existing works of the water plant now being operated and owned by said Des Moines Water Works Company.'' The city, through its attorneys, filed with the clerk of the Supreme Court an application for the appointment of three district judges to act as a court of condemnation; and, on the 21st day of October, that court designated Hon. Chas. E. Ransier, then a district judge of the 10th judicial district, Hon. R. M. Wright, a district judge of the 11th judicial district, and Hon. F. R. Gaynor, then a judge of the 4th judicial district, and required that they meet at the county seat of Polk County within 10 days thereafter. The said judges met accordingly, and, having proceeded to determine the value of said waterworks property, fixed a value thereof as of April 1, 1912, at $2,302,522. An appeal was taken from such award to the district court of Polk County, and the proceedings were thereafter removed by the Des Moines Water Works Company to the district court of the United States for the southern district of Iowa. That court fixed the value of the plant at the same amount as the award and authorized the city of Des Moines to acquire the same by paying the amount thereof to the clerk of said district court of the United States, but reserved to the Des Moines Water Works Company the right to require the city to pay for improvements made subsequent to April 1, 1912. A municipal election was held March 30, 1914, at which a proposition to purchase the plant, and also a proposition to issue bonds aggregating $2,400,000 for the purpose of paying for the waterworks plant, were submitted

to the people.  11,261 votes were cast for, and 9,147 against, the purchase, thus carrying the first proposition, but only 7,516 votes were cast in favor of the proposition to issue bonds, being less than required, and 4,978 against.  On June 1st following, a special election was had, at which the proposition to issue bonds aggregating $2,400,000 for the purpose of borrowing money out of which to pay for the waterworks was submitted to the people, and 10,667 votes were cast, of which 6,725 were for the proposition and 3,942 against it.  On November 3d thereafter, another special election was held to vote upon the issuance of bonds, 7,659 votes being cast in favor of the proposition, and 5,885 votes against.  Thereafter, on November 18, 1914, the city council directed the legal department of the city to prepare the necessary resolution for the issuance of said bonds, on the theory that the proposition had been adopted by the voters, and that the city was proceeding with the intention to issue said bonds unless restrained. Both the plaintiff and the intervener allege that the vote of November 3d was not large enough by several thousands to comply with the requirement of Chapter 118, Acts of the Thirty-fifth General Assembly, and that said bonds, if issued, would be illegal and void, and the proposed action by the city council result in great and unnecessary expense to the city which would be lost to the taxpayers; and further that, if permitted to issue the bonds, the said city will pay the amount of the award and take over the property, if not restrained. Thus far, the allegations of the petition and the petition of intervention are substantially the same.  In addition thereto, the intervener alleged that Chapter 45 of the Acts of the Thirty-third General Assembly, as amended by Chapter 35 of the Acts of the Thirty-fourth General Assembly, is unconstitutional and void.  Demurrers to both the petition and petition of intervener were sustained, and these were dismissed. The plaintiff and intervener appeal.—*Reversed.*

*R. P. Thompson*, for appellant.

*H. W. Byers, Eskil C. Carlson* and *Earl M. Steer,* for appellees.

*Parker, Parrish & Miller,* for intervener, appellant.

LADD, J.—The city of Des Moines was authorized to acquire or construct a waterworks system (Sec. 720, Code Supp., 1913), and, as it might do under Section 721 of such Code Supplement, on June 19, 1911, submitted to the voters of the city the question of whether it should purchase, establish, erect, operate and maintain such system. Though a relatively small number voted, a majority favored purchasing, etc., and thereafter the city council proceeded "to acquire by condemnation" the existing system of the Des Moines Water Company. Section 722, Code Supp., 1913. An appropriate resolution was adopted, October 2, 1911, and on October 15th following, application was made to the Supreme Court for the appointment of three district judges to act as a court of condemnation (Section 722-a, Code Supp., 1913), and district judges were designated accordingly, October 21st. Said judges met, as required by this statute last cited, and fixed the damages to said Des Moines Water Company, consequent on the appropriation of its property, at $2,302,522. On March 30, 1914, the day of the municipal election of officers, the city council submitted to the qualified voters whether the city take over the plant and whether it issue bonds in the amount of $2,400,000 on which to borrow money to pay therefor. The proposition to purchase carried, but that to issue bonds failed, because the affirmative vote was not larger than the majority of the votes cast at the last preceding municipal election, as exacted by Section 1306-e, Code Supp., 1913. A special election was called for June 1, 1914, at which the proposition to issue bonds was again submitted, but for like reason failed, the total vote cast being 10,667. On November 3, 1914, another special election was called, at which 7,659 voted for the proposition, and 5,885 against.

I.   Our first inquiry is whether the affirmative vote was sufficient to authorize the issuance of bonds to provide funds to pay the damages assessed for the taking of the plant.   Prior to the enactment of Chapter 118 of the Thirty-fifth General Assembly, a majority of two thirds only of those voting was exacted as a condition precedent to the issuance of bonds for such purpose.   See Chapter 43, Acts of the Thirtieth General Assembly; Chapter 49, Acts of the Thirty-first General Assembly; Chapter 83, Acts of the Thirty-third General Assembly.

1. MUNICIPAL COR-
PORATIONS:
bonds: author-
ization: "gen-
eral," "munici-
pal," and
"special" elec-
tions.

The statute in the form passed by the Thirty-fifth General Assembly reads:

"If a majority of all the electors voting at such election, provided said affirmative vote be as large as a majority oſ all the votes cast at the last preceding municipal election, vote in favor of the issuance of such bonds, the council of such city or town shall issue the same as provided by Section 726 of the Code and make provision for the payment of the bonds and interest thereon as provided by Title V of the Code."

The change doubtless was due to the difficulty in procuring a full vote at a special election, and the desirability of having the opinion of a large percentage of the electorate expressed on the economic proposition presented.   To accomplish this, the vote at the "last preceding municipal election" was fixed as the criterion.   Does this mean regular election at which officers are chosen, or may it include special elections called for the purpose of authorizing the issuance of bonds?   If the vote at special elections is to be regarded as the criterion, as well as that at the regular election of officers, then it is changeable, not only through successive special elections as these may be called, but in the personnel of the voters; for only males may exercise the right of suffrage in the election of officers, while women may participate in an election to determine whether bonds shall issue.   Again, this would afford those who favor the adoption of the proposition submitted the

opportunity to abstain from voting, thereby reducing the total vote, in order that, at the succeeding election, a smaller number may force the proposition through and thereby defeat the very purpose of amending the statute. It would permit the city council to defeat the object of the statute by calling successive special elections, and thereby fix the criterion by a special election by which to measure the vote cast at that subsequently called.

Section 1089 of the Code declares:

"The term 'general election,' as used in this chapter, shall apply to any election held for the choice of national, state, judicial, district, county or township officers; that of 'city election' shall apply to any municipal election held in a city or town; and that of 'special election' shall apply to any other election held for any purpose authorized or required by law."

This section is preceded by one declaring that the provisions of this chapter shall apply to all elections known to the laws of the state, except school elections. Section 1088, Code. The term "general election" is limited to the choice of certain officers other than those of cities; but the term "city election," though limited to elections held in the city or town, is broad enough to include any municipal election held therein, and really is synonymous therewith. A "special election" is neither a city nor a general election; for, by the express language of this statute, the term applies to "any other election;" that is, other than the general or city elections. A "special election," then, cannot be regarded as a municipal election, for the term "city election" applies to "any municipal election," and a special election is other than a city election. The statute as it appeared in Section 2 of Chapter 33 of the Acts of the 24th General Assembly was limited in its application to the chapter in which contained, and read:

"The term 'general election,' as used in this act, shall apply to any election held for the choice of national, state,

judicial, district, county or township officers, whether for the full term or for the filling of a vacancy. The term, 'city election,' shall apply to any municipal election held in a city or incorporated town."

The context clearly indicates that the word "election," whether general or city, had reference only to the choice of officers, and such is the meaning of the word in Section 1, Article 2, of the Constitution. *Coggeshall v. City of Des Moines*, 138 Iowa 730. As there said:

"Until comparatively recent times, the word 'election,' when applied to political subjects, did not denote the choice of a principle, or the decision of the question of government, or the advice to governing bodies by the electors, and only when declared by the instrument itself to be sufficiently comprehensive to cover these matters has it been construed to have this extended meaning."

*Pritchard v. Magoun*, 109 Iowa 364, construed the section last above mentioned in harmony with this view, in holding that it did not apply to special elections, and that decision was followed in *Bras v. McConnell*, 114 Iowa 401, though the question was whether in a special election the use of the Australian ballot was essential. The scope of the statute was extended by Section 1088 of the Code, so as to apply to all but school elections; and in adding the words, "That (term) of 'special elections' shall apply to any other election held for any purpose authorized or required by law," the legislature evidently designed to extend the provision of the chapter in which included, to elections other than those fixed by law for the election of public officers.

The precise point was involved in *Wright v. Board of Supervisors*, 162 Iowa 82. Section 2448 of the Code required the statement of consent to the sale of intoxicating liquor within any city of 5,000 inhabitants or more to be "signed by a majority of the voters residing in such city, voting therein at the last preceding election, as shown by the poll list of said election." A city election was held March 27, 1911, and a

special election for the purpose of authorizing the issue of bonds July 24, 1911, and a school election of the independent district of Fort Dodge, February 21, 1912, and the court held that:

"The election therein referred to is the last preceding regular election, held by the city for the election of city officers, or a general election held as defined by Section 1089 of the Code."

Each party has directed attention to statutes claimed to be in harmony with the interpretation contended for. An examination of these demonstrates that the legislature, probably out of an abundance of caution, has in many instances qualified the term "city" or "municipal" election by the words "regular," "general;" but we have not discovered any confusion in the use of the term "special election" in its application to matters other than the election of officers. In some statutes adopted prior to Section 1089, Code, 1897, the distinction is not so clearly observed as in those subsequently adopted. Thus Section 1131 of the Code confers on women the right to vote "at any city, town or school election on the question of issuing any bonds." The designation was of government subdivisions, and not the particular election, and named these as distinguished from counties and the state. Moreover, a proposition appropriate for a special election may be submitted at a general or city election, as was done in this and in the *Coggeshall* case. The manifest purpose of enacting Section 1089 in its present form and making it applicable to all elections was to avoid confusion by definitely defining the terms "general," "city," and "special" elections. We are of opinion that, by the words "the last preceding municipal election," in Section 1306-e of Code Supplement, 1913, is meant the last city election of officers held March 30, 1914, and that at no time have the required number of voters expressed themselves in favor of the issuance of bonds.

II.   Section 720, Code Supp., 1913, confers on the cities the power to acquire by purchase or construction and to oper-

ate waterworks for the people thereof, upon an affirmative vote "of the legal electors voting thereon."

2. CONSTITU-
TIONAL LAW:
distribution of
powers: tempo-
rary judicial
tribunals.
Section 722, Code Supplement, provides:

"That when any city or town shall have voted . . . to purchase, establish, erect, maintain and operate . . . waterworks . . . and in such city or town there shall then exist any such . . . waterworks . . . not publicly owned, and the contract or franchise of the owner of which utility has expired or been surrendered and such owner and city or town cannot agree upon terms of purchase, such city or town may, by resolution, proceed to acquire by condemnation, as hereinafter provided, . . . . such . . . waterworks . . . and when so acquired may apply the proceeds of the bonds voted or issued in payment therefor and in making extensions and improvements to such works or plants so acquired; . . ."

Section 722-a directs:

"That upon the passage of the resolution as provided under section one hereof and presentation of a certified copy thereof to the supreme court while in session, or to the chief justice of the supreme court, the said court or chief justice shall, within five days thereafter, appoint three district court judges from three judicial districts, of which one shall be from the district wherein such city or town is located, if he be not a resident of such city or town, as a court of condemnation, and shall enter an order requiring said judges to attend as such court of condemnation at the county seat in the county in which said city or town is located, within ten days thereafter, which judges shall so attend as ordered; and such court of condemnation at the time it meets to organize, as is provided in said order, or at any time during the proceeding, which may be adjourned from time to time for any purpose, may fix a time for the appearance of any person or persons which any party desires to have joined in the proceedings and which the court deems necessary, which time for appearance shall be

sufficiently remote to give notice upon such parties; but if such time of appearance shall occur after any proceedings are begun they shall be reviewed by the court as it may direct to give all parties full opportunity to be heard. All persons not appearing and having any right, title, or interest in or to the property which is the subject of condemnation or any part thereof and including all leaseholders and mortgagee trustees of bondholders which are to be made parties to the proceedings, shall be served with notice thereof, and the time and place of meeting of said court in the same manner and for the same length of time as the service of original notices, either by personal service or service by publication, the time so set being the time at which the parties so served are required to appear, and actual personal service of the notice within or without the state shall supersede the necessity of publication. These provisions shall also apply to condemnation proceedings which are pending, but nothing herein shall be held to invalidate any proceedings or notices served in any proceedings under Chapter 9, Title X, or under the provisions of the act to which this is amendatory which have been had or taken at the time of the taking effect of this act. Such court of condemnation shall have the power to summon and swear witnesses, take evidence, order the taking of depositions, and require the production of any books and papers, as is provided in Chapter 1, Title XXIII of the Code, and a reporter may be appointed, as is provided for the district court; and such court shall perform all the duties of commissioners in the condemnation of property and such duties and the method of condemnation and procedure, including provisions for appeal, shall, except as herein otherwise specially provided, be the same, as nearly as may be, as is provided in Chapter 4, Title X of the Code, but the clerk of the district court of the county where such city or town is located shall perform all the duties required of the sheriff in said chapter and, in case of a vacancy in said court of condemnation, such vacancy shall be filled in the same manner in

which the original appointment was made and the court may review any evidence of its record made necessary by reason of such vacancy.''

The section following directs that the actual expenses of the judges while engaged in such service shall be taxed as costs in the case and shall be paid to the said judges. The intervener contends that these provisions are inimical to Section 1 of Article 3, Section 1 of Article 4, and Sections 1 and 4 of Article 5 of the Constitution, in that (a) they confer on the Supreme Court powers and duties not judicial in character and not belonging to the judicial department of the state; (b) they confer on the Supreme Court powers and duties not appellate or supervisory in character; (c) they confer on the judges of the district court powers and duties not judicial in character and not belonging to the judicial department of the state; and (d) they attempt to confer office on certain district judges of the state by selection of the Supreme Court, in violation of Section 5 of Article 5 of the Constitution. For convenience, these propositions may be taken up in the reverse order.

III. The extraordinary provisions of these statutes are doubtless due to the character of the property to be taken, its great value, and the public and private interests involved. Ordinary commissioners, unless composed of experts, might not be equal to the task of determining the value of such properties with any degree of accuracy, nor, if equal, would their conclusions be likely to command approval. Recognized skill in investigation, ability in comparing and weighing evidence, and sound judgment, ripened by experience, seem essential to the attainment of results at all satisfactory in such a situation. These considerations, and perhaps others, must have influenced the legislature in imposing additional duties on the judges of the district court of the state. That these are judicial in character is not questioned and could not well be. Nor are we inclined to disagree with appellant in assuming that the ''court

of condemnation'' is something more than a commission, and is a tribunal endowed with judicial functions.   The language of the statute is that the three judges constitute the court, and it is endowed with the power of ascertaining the parties interested, fixing the time for their appearance, exacting the service of notice of when such appearance is required, summoning witnesses, taking testimony, ordering the taking of depositions and the production of books and papers, and preserving a record by aid of a shorthand reporter.   In other words, the powers of a judicial tribunal are conferred on such court.   Its report is to the clerk of the district court, instead of to the sheriff, as in other cases, and an appeal may be taken to the district court of the county.   The hearing is like that in a case tried to the court, save that three judges sit instead of one, and possibly greater liberty of inspection may be enjoyed. The manifest design was to create a temporary but distinct tribunal to ascertain the damages consequent upon taking over by municipalities property already devoted to the public use, and we can think of no reason for denying the legislative right to exact such service from district judges.   The duty is surely not subject to the objections considered in *State v. Barker,* 116 Iowa 96.

Nor is the district judge thereby appointed to another office.   He is required as district judge to render a specified service as a member of a tribunal organized to do precisely what might have been exacted from the district court, and from whose decision an appeal may be taken to that court.   Therein he acts as district judge, and not by virtue of a newly created office.   The judge of one court, by becoming a member of or presiding as another court, does not acquire a new office, nor change either court, but, merely by virtue of his office, acts *ex officio* in presiding over another tribunal.   *Dukes v. State,* 11 Ind. 557 (71 Am. Dec. 370) ; *Hollister v. Judges,* 8 Ohio St. 201 (70 Am. Dec. 100) ; *Morriss v. Virginia Ins. Co.* (Va.), 8

3. CONSTITU-
   TIONAL LAW:
   district judges:
   ineligibility to
   office.

S. E. 383; *Commonwealth v. Gross*, 1 Ashm. (Pa.) 281; *In re Application of Judges*, 64 Pa. 33; *Ledoux v. Ducote*, 24 La. Ann. 181; *State v. Engeman* (N. J. L.), 23 Atl. 676.

The judicial power is lodged in the court and not in the magistrate, and we have been unable to discover anything incompatible with the office of district judge in the performance of duties such as are exacted in these statutes. Section 5 of Article 5 of the Constitution declares:

"The district court shall consist of a single judge, who shall be elected by the qualified electors of the district in which he resides. The judge of the district court shall hold his office for the term of four years, and until his successor shall have been elected and qualified; and shall be ineligible to any other office, except that of judge of the Supreme Court, during the term for which he was elected."

Section 6 of the same article provides:

"The district court shall be a court of law and equity, which shall be distinct and separate jurisdictions, and have jurisdiction in civil and criminal matters arising in their respective districts, in such manner as shall be prescribed by law."

The section following makes the judges conservators of peace throughout the state. The remaining three sections relate to salaries, terms of office, and the establishment of judicial districts. It will be observed that the jurisdiction of the court is left to the legislature, and that, in so far as the duties of a judge of the district court are restricted, this is by implication only. Though selected by the electors of a particular district, he may exchange or on proper assignment preside over any district court of the state *(State v. Stingley,* 10 Iowa 488), and is authorized to perform judicial acts outside of court. *McLane v. Granger,* 74 Iowa 152. This power of entering orders facilitating the business of court in vacation has been exercised since the earliest times and freely enlarged by legislation. 23 Cyc. 543. And as there is no con-

stitutional prohibition, power to hear and determine causes in vacation or at chambers may be conferred on trial judges. *Brewster v. Hartley,* 37 Cal. 15 (99 Am. Dec. 237); *State v. Eggers* (Mo.), 54 S. W. 498; *Cresap v. Gray,* 10 Ore. 345.

*Pittsburg, etc., R. Co. v. Hurd,* 17 Ohio St. 144, is often cited as holding generally that orders in vacation must be limited to such subject matters as are within the jurisdiction of the court, but all held was that a judge of the Supreme Court might not rule on a matter then pending in the district court.   It may be conceded, without deciding, that the duties of a judge of the district court should be limited to matters jurisdiction over which might be conferred on such court; for such jurisdiction is expressly conferred by the statutes under consideration.   Since no one other than a judge of the dis-. trict court may preside over it *(Smith v. Frisbie,* 7 Iowa 486), it would seem that the duties of such judges might well be limited to matters, which it may consider, either in determining, reviewing or, having determined, he may participate in reviewing.   In several of the states, notably Illinois and New York, trial judges are designated to sit as members of appellate courts, with limited jurisdiction to correct errors and judgments of the nisi-prius courts of which they are officers. If trial judges may so do, we see no impediment to the performance of duties preliminary and advisory to the work of the trial court preceding and preparatory to its determination, even though this be done as members of a distinct, though subordinate, tribunal.   This is as far as it is necessary to go in the case at bar; but in decisions to which we have referred, the authority of a judge of one court to preside *ex officio* in another has been upheld, and the constitutionality of legislation so directing was sustained in *Balkum v. State,* 40 Ala. 671.   Our conclusion is that there is no constitutional objection to the performance by district judges of service such as exacted by the statute quoted.

IV.   The proceedings are initiated by the resolution of

the city council, and, upon the presentation of a certified copy thereof to the Supreme Court, that body is authorized to designate the district judges who are to constitute the court of condemnation, established for a single specified purpose. The tribunal is of legislative creation. The court merely designates who shall constitute it. In so doing, no one is appointed to office, but officers are assigned to the performances of certain duties. As members of the court of condemnation, they do not cease to be the judges of the district court.

4. CONSTITU-
TIONAL LAW:
district judges:
ineligibility to
office: appoint-
ment.

Appellant has argued the case on the theory that, under the statute, this court is authorized to appoint to an office, and for this reason the statute is inimical to the Constitution, for that, as is said, appointment to office is intrinsically an executive function. Our form of government is separated into the three departments, legislative, executive, and judicial; and it is said that appointment to office or position by the judiciary would encroach on the executive department, in violation of Section 1 of Article 3, declaring:

5. CONSTITU-
TIONAL LAW:
distribution of
powers: ap-
pointments by
judiciary.

"The powers of the government of Iowa shall be divided into three separate departments: the legislative, the executive and the judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed or permitted."

The question to be determined, then, is whether the exercise of the appointive power is exclusively executive. If it is, no one will be found contending that it may be exercised by the general assembly or the courts. That the departments are equal, though dissimilar, and independent of each other, though parts of a consistent whole, has been so often said that neither citation nor elaboration is necessary. The legislative power lodged in the general assembly is the power to make,

alter or repeal laws. The executive power is the power to execute the laws, and is vested in the governor and the administrative officers of the state and of the several subdivisions thereof. The judicial power is ordinarily defined to be the power to construe and interpret the Constitution and laws, and to apply them and to decide controversies, and is vested in courts. Their power extends beyond that merely to hear and decide, however. Bouvier defines judicial power as "Belonging to or emanating from a judge as such; the authority vested in a judge," and Webster defines the word judicial "as pertaining to courts, as judicial power," and "proceeding from a court of justice, as judicial determination." Says the Court of Appeals of New York:

"Whatever emanates from a judge as such, or proceeds from a court of justice, is, according to these authorities, judicial." *In re Cooper*, 22 N. Y. 67, 82.

In *State v. Noble*, 118 Ind. 350 (10 Am. St. 143), the court, after citing these definitions, says:

"It cannot be doubted that judicial power includes the authority to select persons whose services may be required to act as the assistants of the judges in the performance of their judicial functions, whether they be referees, receivers, attorneys, masters, or commissioners."

A constitution, as said by Judge Cooley, "assumes the existence of a well-understood system, which is still to remain in force," and to ascertain what is meant by judicial power we may look into its exercise prior to the adoption of the Constitution. That each department may make such appointments as are essential to the proper and independent discharge of its functions, is not questioned. There are administrative acts essential to the discharge of legislative as well as of judicial functions, which economically and conveniently may be performed by assistants; and, as either the legislature or the judiciary might, may, or must, under the Constitution, perform such acts, they may select those who are to aid in such

performance. *In re Janitor*, 35 Wis. 410; *State v. Smith*, 15 Mo. App. 412; *Commissioners v. Hall*, 7 Watts (Pa.) 290. In *State v. Noble*, supra, it is said:

"No one would . . . be so bold as to assert that the legislature may not appoint officers connected with its duties and proceedings, and there is no more reason for denying power to the courts than there is of denying it to the legislature. The truth is, that all independent departments have some appointing power, as an incident of the principal power, for without it no department can be independent; *State v. Barbour*, supra; *Achley's Case*, 4 Abb. Prac. (N. Y.) 35. We are not here dealing with the general power to appoint, but we are dealing with a single phase of the general question, and we do no more than affirm that each department must have, and does have, some appointing power, and that where an appointment is essential to the proper exercise of a judicial duty, the court concerned has authority to make the appointment. If this be not true, then no court can appoint a guardian, an administrator, a receiver, a referee, an appraiser, or a commissioner. It is, in truth, impossible to conceive of the existence of an independent judicial department without the power to make some appointments. The denial of this incidental power is the annihilation of judicial independence."

But is the power of appointment so limited? Is it essentially executive? The Constitution provides for the election of officers in the different departments of government, but is silent as to appointments, except that, in Section 4 of Article 4, the general assembly is authorized to elect one of two or more persons having an equal vote, being highest, as governor or lieutenant governor, and Section 10 of the same article declares that:

"When any office shall, from any cause, become vacant, and no mode is provided by the Constitution and laws for filling such vacancy, the governor shall have power to fill such vacancy, by granting a commission, which shall expire at the

end of the next session of the general assembly, or at the next election by the people."

Impliedly, the manner of filling vacancies, as well as by what officer, is relegated to the general assembly, as is the matter of all appointments, save those of governor and lieutenant governor. In many of the Constitutions, the executive is designated the appointing power; in others, to fill appointive positions; and this has influenced the courts in passing on this question. One line of decisions assumes the power of appointment to be essentially executive and denies to the general assembly and the courts the authority to appoint to any office or position not incidental to the actual discharge of their constitutional functions. *State v. Barbour*, 53 Conn. 76 (55 Am. R. 65); *City of Evansville v. State*, 118 Ind. 426 (4 L. R. A. 93); *Taylor v. Commonwealth*, 3 J. J. Marsh (Ky.) 401; *State v. Noble*, 118 Ind. 350 (10 Am. St. 143, 4 L. R. A. 101). See *In re Janitor*, 35 Wis. 410; *State ex rel. Gubbins v. Anson* (Wis.), 112 N. W. 475.

Another line of cases, and perhaps the larger number, proceeds on the theory that the appointment to office is not inherently or intrinsically executive in character, but that it is the exercise of a political power not conferred on any department, but depending on legislative will alone. *People v. Morgan*, 90 Ill. 558; *Fox v. McDonald*, 101 Ala. 51 (21 L. R. A. 529, 46 Am. St. 98); *Mayor, etc., of Baltimore v. State*, 15 Md. 376 (74 Am. Dec. 572); *State v. George* (Ore.), 16 L. R. A. 737 (29 Am. St. 586); *People v. Freeman*, 80 Cal. 233 (13 Am. St. 122). After reviewing the decisions, in a note to the last case Mr. Freeman observed:

"The truth is, that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legislative, the executive, or the judicial department. It is commonly exercised by the people, but the legislature may, as the law-making power, when not restrained by the Constitution, provide for its exercise by either department of the

government, or by any person or association of persons whom it may choose to designate for that purpose. It is an executive function when the law has committed it to the legislature, and a judicial function, or at least a function of a judge, when the law has committed it to any member or members of the judiciary.''

Some of these decisions emphasize the thought that involved in the appointment is the determination of whether the applicant is qualified and the selection, from a number, of him best qualified, and this is a function of a judicial character. We are not inclined to regard the appointing power as intrinsically executive. It is not so treated in the Constitution, but is left to legislative discretion. Its exercise involves something more than merely issuing commissions—discretion and judgment in making a choice. Though the executive element may so far predominate as that the executive department properly may be clothed with authority to make appointments in other departments, there is no sound reason for denying to the judiciary the power, when authorized by the general assembly, to designate persons or officers to office or discharge duties within the proper sphere of the judicial department. The question was before this court in *State v. Barker*, 116 Iowa 96, where, in reaching a decision, neither of the above lines of authority was strictly followed; for, while conceding that appointment to office generally is an executive function, it was said that not every appointment is executive in character, and the rule was laid down that:

''Powers not in themselves judicial, and that are not to be exercised in the discharge of the functions of the judicial department, cannot be conferred on courts or judges designated by the Constitution as a part of the judicial department of the state. . . . Of course, the act itself need not be judicial in character. If the general power be judicial, or if the act itself be in aid of some judicial function, it is sufficient.''

This was followed by illustrations, such as the appoint-

ment of commissioners to assess damages for the opening of a highway, jury commissioners, determining whether a municipal corporation shall be created or adjoining territory annexed, and the like, and the appointment of trustees to manage and control a waterworks system belonging to a municipality and not in litigation was held not to be a judicial function. This was on the broad ground that the office or position did not in some form relate to the administration of justice, the court saying:

"Judges of courts created by the Constitution should not be burdened with executive or administrative duties. They should, as nearly as possible, be freed from everything not judicial in character."

Necessarily, the functions of the different departments shade into each other, as do the colors of the rainbow, and the performance of executive duties often involves the exercise of judicial functions of even the most delicate character, and the courts frequently, in the efficient discharge of their duties, must exercise the executive function. The elements are distinct in the main, even though it is often difficult to say which predominates; and in a considerable field there is enough of each function involved to preclude the charge that the exercise of the appointing power by either is an encroachment on the exclusive domain of the other. The principle, then, of *State v. Barker*, supra, that the performance of judicial acts or the doing of an act in itself in aid of some judicial function is not inimical to any provision of the Constitution, finds support in *In re Supervisors of Election*, 114 Mass. 247. A statute required a justice of the Supreme Court of Massachusetts, upon the filing of a petition, to appoint supervisors of election; and four of the justices, speaking through Gray, C. J., declared the statute unconstitutional, saying, among other things:

"The justices of this court, as incidental to the large and varied judicial powers and jurisdiction, . . . . embracing cases criminal and civil, in common law, equity, probate and

divorce, may be and have been by many statutes authorized to appoint subordinate officers of various kinds to assist in the performance of their judicial duties, such as auditors, special masters in chancery, commissioners to take depositions in other states in cases pending here, commissioners to take bail, commissioners for the partition of lands, division of flats, or the setting off of dower, commissioners of sewers, or for the improvement of meadows and low lands, and commissioners to adjust the rights of transportation and modes of connection between connecting lines of railroad, or to assess the expenses, as between different counties, towns and other corporations, of maintaining roads or bridges. Parts of the duties performed by some of these officers in carrying out their functions are executive in their nature, and of a class which might be imposed by law upon strictly executive officers. But all the officers above enumerated, when appointed by the court, are by express requirement or necessary implication obliged to return a report of their doings to the court for its judicial action.

The judges may also be authorized by law, except so far as otherwise expressly provided by the Constitution, to appoint clerks of courts. But the duties of such clerks are in no sense executive; they are merely ministerial, and incident to the administration of justice. On like grounds, the courts are authorized, in the absence of the official prosecutor, to appoint a suitable person to perform his duties; and to appoint all officers necessary to the transaction of their business. . . . ''These supervisors, although entrusted with a certain discretion in the performance of their duties, are strictly executive officers. They make no report or return to the court or to any judge thereof. Their duties relate to no judicial suit or proceeding, but solely to the exercise by the citizens of political rights and privileges.''

In *State v. Anson* (Wis.), 112 N. W. 475, an act conferring on circuit courts the authority to appoint jury commissioners was upheld; and in *Foster v. Rowe*, 128 Wis. 326

(8 Am. & Eng. Ann. Cas. 595), an act directing the appointment by the same court of commissioners to equalize assessments made by county boards of supervisors was held constitutional. In *Citizens' Savings Bank v. Town of Greenburgh* (N. Y.), 65 N. E. 978, empowering a court to designate commissioners to lay out a highway extending through two or more towns was declared valid. In each, the duties devolving on the appointees were so far judicial, or so connected with the administration of justice, that their appointment was adjudged not to be an encroachment on the functions of any other department. The distinction is illustrated by *State v. Neble* (Nebr.), 19 L. R. A. (N. S.) 578, where a statute authorizing the judges of the district court of the judicial district in which a city was located to appoint the park commissioners thereof, was held unconstitutional on the ground that their duties, over which the judges were given supervision, were wholly administrative and executive. That the designation of persons to exercise duties wholly or in the main judicial will not interfere in any manner with the exercise of exclusively executive functions is too manifest for argument. On the other hand, conferring the power to designate the persons so to do may and probably would be conducive to the better accomplishment of the objects sought to be attained through the courts. Only on the theory that the making of all appointments pertains to the executive department can the power to the extent stated be denied the courts, when conferred by appropriate legislation. We do not so construe the power to appoint; and, though the executive element may exist in all appointments, enough of the judicial is involved so that, in all matters pertaining to the discharge of judicial duties, the power of selecting the appropriate persons with suitable qualifications may be conferred on court or judge without violating the command of the fundamental law, that:

"No person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others."

Beyond this we do not go, and adhere to the principle announced in *State v. Barker,* that the judiciary may not appoint a person to an office or position exacting the discharge of executive or legislative duties only. In the case at bar, this court was not called upon to appoint anyone to office judicial or otherwise, but merely to assign three judges to the performance of certain judicial duties. As these were to be performed by judges of the nisi-prius courts, it was particularly appropriate that their selection be left to the judges of this court, or rather, to the court, which is practically the same thing.

In view of the conclusion we have reached, it may be unnecessary to take up the argument of the city that the designation of the district judges was within the supervisory powers of this court. It will not be amiss, however, to refer to the contention briefly. Section 1 of Article 5 of the Constitution declares:

6. CONSTITU-
TIONAL LAW:
distribution of
powers.

"The judicial power shall be vested in a Supreme Court, district court, and such other courts, inferior to the Supreme Court, as the general assembly may, from time to time, establish."

Section 4 of the same article reads:

"The Supreme Court shall have appellate jurisdiction only in cases in chancery, and shall constitute a court for the correction of errors at law, under such restrictions as the general assembly may by law prescribe; and shall have power to issue all writs and process necessary to secure justice to parties, and exercise a supervisory control over all inferior judicial tribunals throughout the state."

While the Constitution created the courts, it has not undertaken to specify in detail their functions nor to define their power, save plainly to indicate that the entire judicial power has been conferred on them. Terms are not defined, but language of precise and technical meaning in the science

of government and law is used. The Supreme Court is that of last resort, but the means whereby its jurisdiction is to be exercised are not prescribed. The import of the first two clauses in the section quoted is restrictive, for the jurisdiction in the one is declared to be appellate only, and the other may be restricted by the general assembly; otherwise, the jurisdiction of the court might be more ample than the policy might demand or convenience require. *Powell v. Spaulding,* 3 G. Greene 417. At the same time, the framers of the Constitution evidently apprehended danger in restricting the court entirely to the functions of an appellate tribunal; for contingencies might arise wherein the interposition of the highest judicial tribunal alone would be adequate to preserve the balance of powers, arrest usurpation on the one hand or quell resistance to constitutional authority on the other, guarding the liberty of the citizen and shielding the sovereignty of the state. Therefore, in seeming exception to all that preceded, they conferred unlimited supervisory control over inferior tribunals throughout the state and authority to issue all writs and process necessary to secure justice to parties. Within this sphere is a grant of unlimited power. As was concluded in an exhaustive note to *State v. Johnson,* 103 Wis. 591 (51 L. R. A. 33, 111):

"The superintending control is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur it will be found able to cope with them."

In the cited case, the application was for a writ of mandamus directing the circuit court to vacate certain orders and grant certain creditors the right to examine the assignees and officers of the assignor bank and interpose objections to the assignee's accounts, and with great clearness the chief

justice of that court vindicated the right of creditors to the relief prayed. With reference to the origin of this power, the court said:

"The English court of King's bench had a superintending jurisdiction over all the inferior courts of the realm, which it freely exercised by the use of well-defined writs from very early times. The Norman idea was that the King was the foundation of all justice, and hence, when an inferior court executed its jurisdiction, or refused to act within the jurisdiction to the prejudice of a suitor, and no other remedy was provided, application could be made by the aggrieved party to the King's court to restrain or compel action. The King's bench was peculiarly the King's court, in which he sometimes sat himself, and was always supposed to sit when not personally present. It succeeded in this respect the very ancient *aula regis* when (near the close of the Norman period) that court was divided into the courts of the King's bench, common pleas, and exchequer. Being the King's court, it was natural, if not inevitable, that the King's sovereign power of causing justice to be dealt to his subjects in the course of litigation in inferior courts should be administered by and through that court. Blackstone says of this court (Com. bk. 3, chap. 4, p. 42): 'The jurisdiction of this court is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here or prohibit their progress below. It superintends all civil corporations in the Kingdom. It commands magistrates and others to do what their duty requires in every case where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition. It takes cognizance both of criminal and civil causes, the former in what is called the Crown side or Crown office, the latter in the plea side of the court.'"

See also *State v. Neville* (Mo.), 51 L. R. A. 95, and *People v. Court of Appeals* (Colo.), 51 L. R. A., 105. Another valuable note bringing to date that previously

referred to will be found in *State v. Williams*, 136 .Wis. 1 (20 L. R. A. [N. S.] 941.). These notes, with the opinions to which annexed and those cited, constitute the most valuable discussion on this subject to be found. In a concurring opinion in *State v. Helms* (Wis.), 118 N. W. 158, Marshall, J., has reviewed the Wisconsin authorities (and that court appears to have investigated the power of supervisory control more profoundly and exercised it more frequently than any other), and reaches the conclusion:

" (1) The second constitutional grant of power to this court, that of 'general superintending control over all inferior courts,' is not limited other than by the necessities of justice. It extends to judicial as well as jurisdictional errors. (2) The necessities of justice, in a legal sense, do not reach beyond the scope of governmental policy as to righting wrongs by judicial interference; as, for example, it stops in criminal cases at the constitutional prohibition of a second jeopardy. (3) The grant of superintending control, though without specified means or instrumentalities for its exercise, includes, by necessary implication, all common-law writs and means applicable thereto and all power necessary to make such writs and means fully adaptable for the purpose. (4) The extent of the power of superintending control, as to any particular group of circumstances, is not measurable by that of the common-law writ most adaptable in its ordinary scope to vitalize such power in regard to such circumstances. Such extent is referable to the necessities of the case, and the ordinary use feature of the writ is to be expanded to meet the exigencies thereof. (5) The common-law writs, with the power indicated to adapt them, leaves no part of the court's superintending control power to be necessarily dormant for want of means to vitalize it. (6) The existence of error in the field of the controlling power does not, necessarily, upon proper request in form, require the doors of the jurisdiction to open. When that should occur rests in sound judicial discretion. (7) By the policy of this court, its superintending control power is to be exer-

cised only when the right of the matter involved is plain, there is no other efficient remedy for its invasion or denial, such invasion or denial is prejudicial, and, generally, and especially as to errors not strictly jurisdictional, the case presents circumstances of exceptional or extraordinary hardship."

This is a fair summary of the principles which must obtain in exercising supervisory powers within the field considered. While, on the one hand, supervisory control, being granted by the fundamental law, may not be restricted save by obviating the necessity for its exercise, on the other, opportunities for its exercise may be increased by legislation. By this statute, it has provided for the organization of a tribunal for the condemnation of property in the exercise of the right of eminent domain which seems to be endowed with all essential attributes of a court, even though it is to proceed no further than the assessment of damages, which, under our system, is all that is done on final hearing. If it be an inferior tribunal such as is contemplated in the section of the Constitution hereinbefore quoted, and intervener does not argue otherwise, it is within the supervising authority of the Supreme Court.

To supervise is "to oversee for direction; to superintend; to inspect with authority" and to control means "to exercise restraining or governing influence over . . . to regulate; to govern; to overpower." From these definitions, that of supervisory control may be deduced; and surely within it is the designation of judges best qualified to render the peculiar service exacted from a large number throughout the state. That the rendition of service by them commences·with the organization of the tribunal furnishes no objection; for at what period of litigation the power of this court may be exerted cannot be defined, save to say that this always may happen whenever the exigencies of the situation require its interposition. We are of opinion that this court acted within its constitutional authority in designating the district judges who constituted the court of condemnation, as well as they in

performing the duties to which they were assigned; but we find that the city council was never authorized to proceed at any time by a majority of the voters equal to a majority of the votes cast at the last preceding city election.—*Reversed.*

All the Justices concur.